[No. 64368-7. En Banc.]
Argued May 13, 1997.     Decided December 24, 1997.

RICHARD C. GOSSETT, ET AL., *Respondents*, v. FARMERS INSURANCE COMPANY OF WASHINGTON, *Petitioner*.

*Clarke, Bovingdon & Cole,* by *Mark S. Cole* and *Mark E. Mills*; and *Andrea Vingo,* for petitioner.

*Williams Law Office,* by *Gary Williams,* for respondents.

*Bryan P. Harnetiaux* and *Debra L. Stephens* on behalf of Washington State Trial Lawyers Association, amicus curiae.

MADSEN, J. — In this action for homeowners' insurance benefits the parties dispute the nature and extent of the insurable interest which Richard and Margaret Gossett had in an unfinished house destroyed by fire, as well as the constitutionality and propriety of attorney fees awarded under *Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991). We affirm the trial court's holding that the Gossetts had an insurable interest in the property only to the extent of improvements they made prior to the fire, and accordingly reverse the Court of Appeals' decision. We uphold the constitutionality of an attorney fees award under *Olympic S.S. Co.*

## FACTS

In 1990, the Gossetts found an unfinished house in Tacoma which they wished to buy, complete, and sell at a profit. They offered $90,000 and estimated they would need another $60,000 to $70,000 to finish the house. Their offer was accepted by the owner, Mr. Gunns, after two previous offers expired. The Gossetts signed an earnest money agreement and had 30 days to arrange financing. They were unable to acquire conventional financing[1] and, therefore, attempted to obtain a loan through a broker specializing in hard to place loans, Trusty Deed Services.

---

[1]The Gossetts had declared bankruptcy in 1981, and had an outstanding Internal Revenue Service tax lien.

They signed a fee agreement with Trusty Deed providing that in exchange for Trusty Deed obtaining financing on a best-effort basis, the Gossetts would pay a fee of five percent of the loan amount. Trusty Deed was unable to locate financing in the full amount desired by the Gossetts. Instead, it was able to obtain financing for the purchase price only. Further, the investor-lender providing the funds, Ms. Crennell, was willing to provide only temporary financing. In order to carry out their plans to purchase the house, therefore, the Gossetts had to obtain long-term financing.

In late August, the Gossetts spoke with a Farmers Insurance Company agent about insurance on the home. Mr. Gossett represented to the agent that the Gossetts would be the legal owners of the property. A policy was issued with the Gossetts as the named insureds and Trusty Deed as the mortgagee. According to the agent, the policy would not have been issued in the Gossetts' names had he known that the Gossetts were not legal owners.

On August 30, 1990, the Gossetts assigned all their interest in the purchase and sale agreement to Trusty Deed. They also signed an addendum to the purchase and sale agreement providing "Title to be taken in the name of Trusty Deed . . . ." Clerk's Papers (CP) at 88. When the sale closed on September 5, 1990, title was placed in Trusty Deed, and Trusty Deed was listed as the buyer in the closing documents. There is evidence that Trusty Deed did not intend to buy or become record owner of the property. There is also evidence that title was placed in Trusty Deed because the Gossetts feared losing the sale to a back-up purchaser, as well as evidence that Ms. Crennell required title to be placed in Trusty Deed. Paul Anderson, who acted on behalf of Trusty Deed, stated that the Gossetts were to repay the money loaned by Ms. Crennell by October 4, 1990. However, the only promissory note in the record obligates Trusty Deed to repay Ms. Crennell for the loan. As events developed, the money was not repaid in a timely fashion. Ms. Crennell sued Trusty Deed on the

promissory note and obtained a judgment against Trusty Deed.

The record contains no evidence of any written agreement obligating the Gossetts to repay any money loaned for purchase of the property or of any written agreement under which the Gossetts could purchase the property from Trusty Deed.

The Gossetts began to work on the house in early September. Mr. Gossett testified that on November 18, 1990, he was working on the house when he fell and knocked over a kerosene heater, causing a fire that destroyed the house. At the time, the Gossetts were storing some of their belongings in the unfinished house and their sons stayed in the house at least some of the time to watch over things. The Gossetts had been staying at a motel and planned to move into the house the next day.

At the time of the fire, the Gossetts still had not obtained long-term financing. Although Mr. Gossett testified he had obtained long-term financing, the evidence is equivocal at best as to whether the Gossetts had in fact found a source of long-term financing. The record does not show any commitment for such financing other than Mr. Gossett's claim that such financing had been secured. Although a letter from a Mr. Moore to Trusty Deed mentions "processing a loan" for the Gossetts, Mr. Moore declared that if there had been a commitment to provide financing, there would have been documentation to that effect; he had none, and the fact that he had no such documentation "confirms that no such agreement was ever made." CP at 231, 314. Also, although Mr. Gossett testified he had a commitment for long-term financing, he conceded there was nothing in writing.

After the fire, Trusty Deed was not able to pay Ms. Crennell in full and therefore transferred its rights in the property to her.

The Gossetts filed a claim with Farmers. Farmers paid the Gossetts for the loss of personal property destroyed in the fire and issued a check for $114,818 payable to Ms.

Crennell, Trusty Deed, and the Gossetts. Nearly a year after the fire, the parties entered into a settlement agreement under which the Gossetts added $5,000 to the amount of the Farmers' check, and Trusty Deed was paid $4,000 and Ms. Crennell was paid $115,818. Also as part of the settlement, the judgment Ms. Crennell had obtained against Trusty Deed was satisfied, and both Trusty Deed and Ms. Crennell quitclaimed the property to the Gossetts.

In October 1991, the Gossetts sued Farmers, claiming they were entitled to benefits for damage to the house and for loss of use. Farmers maintained the Gossetts had no insurable interest in the house, or, in the alternative, had only a limited interest. Farmers also maintained the policy was issued under a mistake of fact as to ownership of the house. Both sides moved for summary judgment on the issue of insurable interest. The trial court granted the Gossetts' motion, but ruled that their insurable interest was limited to the improvements they made prior to the fire. The parties then settled all claims, with the Gossetts reserving the right to appeal the issue of insurable interest. The trial court awarded the Gossetts $25,912.50 in attorney fees.

Farmers appealed, and the Gossetts cross-appealed. The Court of Appeals partially reversed the judgment. *Gossett v. Farmers Ins. Co.*, 82 Wn. App. 375, 917 P.2d 1124, *review granted*, 130 Wn.2d 1016 (1996). The court held that an issue of fact remained as to whether and to what extent the Gossetts had an insurable interest in the house other than the improvements they made. The court expressly entertained the possibility of an insurable interest in profits the Gossetts expected from sale of the house once it was finished. The Court of Appeals affirmed the award of attorney fees and awarded the Gossetts attorney fees on appeal. We granted Farmers' petition for discretionary review.

## ANALYSIS

On review of summary judgment, the appellate court

engages in the same inquiry as the trial court. *Honey v. Davis*, 131 Wn.2d 212, 217, 930 P.2d 908, 937 P.2d 1052 (1997). The facts and inferences therefrom are viewed in the light most favorable to the nonmoving party, and summary judgment may be granted when there are no material issues of disputed fact and the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c).

## Insurable Interest

■ The Farmers' policy provides: "Even if more than one person has an insurable interest in the covered property, we shall *not* pay more than: (1) an amount equal to the insured's interest, or (b) the applicable limit of insurance." CP at 15. Pursuant to RCW 48.18.040(2), an "insurable interest" is "any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage." As Farmers concedes, under this definition legal title to property is not dispositive of whether one has an insurable interest in property. Thus, the fact that Trusty Deed held title to the property at the time of the fire does not preclude the Gossetts from having an insurable interest in it. Farmers maintains, however, that the Gossetts had only a speculative, expectation interest in the property at the time of the fire. We agree that on the facts of this case, the Gossetts did not have an insurable interest in the property beyond the improvements they made.

The record shows that the Gossetts intended to purchase the property from Mr. Gunns. However, at the time the fire broke out, they had been unable to carry out that intent because of problems securing long-term financing for the purchase price and construction costs to finish the house. They clearly did not purchase the property. Instead, they assigned "all interest" in their purchase and sale agreement to Trusty Deed. CP at 86. All the closing documents list Trusty Deed as the buyer, and title was placed in Trusty Deed. The fact that the Gossetts did not purchase the property is further borne out by Mr. Gos-

sett's own testimony. When Mr. Gossett was deposed, he testified about his attempt to secure long-term financing, and testified that he had found such financing but with nothing in writing. He was then asked:

Q  Did you buy the house from Trusty Deed then?

A  No.

Q  Prior to the fire?

A  No.

Q  Why didn't you buy the house prior to the fire?

A  Because the fire happened before the loan transpired.

Q  Was there a real estate purchase and sale agreement prior to the fire that you signed to purchase the house from Trusty Deed?

A  Yes.

Q  Now I'm not talking about the original one signed in July.

A  No, this is one that was sent to Trusty Deed.

Q  And do you know the approximate date of that document?

A  Sometime in October I would estimate.

Q  And did Trusty Deed sign it?

A  No.

CP at 610. Mr. Gossett's testimony that he tried to purchase the property from Trusty Deed before the fire confirms that the Gossetts were not purchasers of the property. Thus, while there is evidence that Trusty Deed did not intend to buy the property, Trusty Deed did in fact buy the property because of the Gossetts' inability to obtain long-term financing.

The Gossetts claim, though, that Trusty Deed merely held the deed to the property as security. Where a party is indebted on property and the property stands as security for the debt, the party has an insurable interest in the property. *See, e.g., Integon Gen. Ins. Corp. v. Gibson*, 226

Ga. App. 152, 485 S.E.2d 576, 578 (1997); *Kilpatrick v. Hartford Fire Ins. Co.*, 701 S.W.2d 755 (Mo. Ct. App. 1985).

Here, the record does not reveal any obligation on the Gossetts' part to purchase the property. The written agreement they had with Trusty Deed was a fee agreement where Trusty Deed agreed to "assist APPLICANT in obtaining financing on a best-effort basis." CP at 48. The agreement provided that Trusty Deed had the exclusive right to obtain financing "from a LENDER" and that in consideration of services rendered, the Gossetts would pay a fee of five percent of the loan amount obtained to Trusty Deed. *Id.* There is no writing which memorializes any indebtedness on the Gossetts' part to either Trusty Deed or Ms. Crennell. There is no promissory note, no mortgage documentation, and no deed of trust. Nothing *prior* to the fire documents any security interest given by the Gossetts to either Trusty Deed or Ms. Crennell.

Instead, the only promissory note in the record is signed by the president of Trusty Deed and obligates Trusty Deed to pay Ms. Crennell. Not only does this note indicate that Trusty Deed purchased the property and incurred indebtedness for that purchase, rather than the Gossetts, it also shows that both Trusty Deed and Ms. Crennell were aware of the importance of such documentation. Thus, if the Gossetts had owed Trusty Deed or Ms. Crennell for the property, there should be a promissory note from the Gossetts to Trusty Deed or Ms. Crennell.

Moreover, when the Gossetts, Trusty Deed, and Ms. Crennell finally reached a settlement agreement respecting the payment of $114,818 from Farmers to them jointly, certain facts were set out in it. Among them is the fact that when the money due to be repaid to Crennell was not paid in a timely fashion, Crennell sued Trusty Deed on the promissory note it had signed and obtained a judgment against Trusty Deed. The record simply shows no indebtedness on the Gossetts' part for any "purchase" of the property.

Further, Mr. Gossett's testimony that he tried to ar-

range to purchase the house from Trusty Deed before the fire is inconsistent with any claim that the deed was held by Trusty Deed merely as security for indebtedness on the part of the Gossetts.

It is a long-standing rule that when property is conveyed by a deed absolute in form, with nothing in the collateral papers to show any contrary intent, the presumption is that the transaction is what it appears to be on its face and any party who claims that the transaction is other than what it appears to be must prove that claim by clear and convincing evidence. *Johnson v. National Bank of Commerce*, 65 Wash. 261, 268-69, 118 P. 21 (1911); *Hoffman v. Graaf*, 179 Wash. 431, 436, 38 P.2d 236 (1934). If the deed is conveyed with the intent of the parties being to create a debtor-creditor relationship, then the deed may be declared to create an equitable mortgage. *Beadle v. Barta*, 13 Wn.2d 67, 123 P.2d 761 (1942); *accord Thomas v. Osborn*, 13 Wn. App. 371, 375, 536 P.2d 8, 88 A.L.R.3D 898 (1975) (a legal or equitable mortgage arises at the time of the transaction when money is loaned or credit given and the parties intend to create a lien upon the property of the debtor as security for payment of the debt). "[T]he character of the transaction is fixed at its inception and . . . it is what the intention of the parties makes it." *Johnson*, 65 Wash. at 268. "[C]lear and convincing evidence must be produced to establish that the deed was given as security and was intended as a mortgage." *Id.* at 269. "The intent must be that of both parties." *Hoffman*, 179 Wash. at 436. In determining the parties' intent, all the circumstances surrounding the transaction may be considered. *Pittwood v. Spokane Sav. & Loan Soc'y*, 141 Wash. 229, 233, 251 P. 283 (1926). The lack of any note evidencing indebtedness has been a major consideration in decisions holding that no mortgage was created where a conveyance was made by a deed absolute on its face. *Wakefield v. Greenway*, 141 Wash. 204, 211, 251 P. 112, 256 P. 503 (1926); *Nutter v. Cowley Inv. Co.*, 85 Wash. 207, 210-11, 147 P. 896 (1915).

In this case the evidence prior to the fire is insufficient to show, under the clear and convincing standard, that the deed from Mr. Gunns to Trusty Deed, absolute on its face, was intended as a security device for any indebtedness on the Gossetts' part.

Further, we note that an assignment of all interest in property which also involves extinguishment of indebtedness on the property generally eliminates any economic interest in the property and thus eliminates any insurable interest in the property. *CLS Mortgage, Inc. v. Bruno*, 86 Wn. App. 390, 937 P.2d 1106 (1997); *see Davis v. Oregon Mut. Ins. Co.*, 71 Wn.2d 579, 581, 429 P.2d 886 (1967) (former property owner lost his insurable interest in property when he sold the property before the insurance policy expired). The Minnesota Supreme Court has held that an assignment of all a party's interest in property without any obligation on the assignor's part to repurchase the property divests the assignor of any insurable interest. *Hane v. Hallock Farmers Mut. Ins. Co.*, 258 N.W.2d 779 (Minn. 1977). Here, as noted, the Gossetts assigned "all interest" in their purchase money agreement with Mr. Gunns to Trusty Deed and had no documented indebtedness on the property.

The Gossetts, however, point to the post-fire quitclaim deeds conveying any interest in the property held by Trusty Deed and Ms. Crennell to the Gossetts and stating that the conveyances were in part for "release of security."[2] A claimant must have an insurable interest at the time of the loss. 4 JOHN A. APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 2122, at 31 (1969). The after-the-loss execution of the quitclaim deeds, offered to establish the parties' intent as to a transaction occurring well before the loss, should be viewed with caution.

The quitclaim deeds here were actually executed as a result of the settlement negotiations over the check from

---

[2]In each of the quitclaim deeds "release of security" is in different typeface from the rest of the deed.

Farmers made payable jointly to Trusty Deed, Ms. Crennell, and the Gossetts. The settlement agreement was finally entered into nearly one full year after the fire. *See* CP at 247. At that time, it appears from the record that Ms. Crennell wanted repayment of the amount due her, Trusty Deed wanted entry of satisfaction of the judgment obtained by Ms. Crennell against it, and neither wanted the property, which had the debris from the burned house on it. Under these circumstances, and where there is no documentation at the inception of the transaction between Trusty Deed and the Gossetts showing any indebtedness on the part of the Gossetts, the well-after-the-fire execution of the quitclaim deeds stating they were for release of security is doubtful evidence of any intent behind the conveyance of the property to Trusty Deed before the house was destroyed.

Just as importantly, the value of the post-fire documentation must be viewed in light of significant public policy militating against the Gossetts' claim that their insurable interest extended at least to the full value of the house. A fundamental principle of insurance law is that

> opportunities for net gain to an insured through the receipt of insurance proceeds exceeding a loss should be regarded as inimical to the public interest. In other words, insurance arrangements are structured to provide funds to offset a loss either wholly or partly, and the payments made by an insurer generally are limited to an amount that does not exceed what is required to restore the insured to a condition relatively equivalent to that which existed before the loss occurred. The concept that insurance contracts shall confer a benefit no greater in value than the loss suffered by an insured is usually referred to as the "principle of indemnity."

ROBERT E. KEETON & ALAN I. WIDISS, INSURANCE LAW, A GUIDE TO FUNDAMENTAL PRINCIPLES, LEGAL DOCTRINES, AND COMMERCIAL PRACTICES, PRACTITIONER'S EDITION § 3.1(a), at 135 (1988).

The doctrine of insurable interest is tied to the principle of indemnity and serves a number of purposes, among

them the prevention of using insurance contracts as gambling or wagering contracts. *Id.* § 3.1(c), at 136. Additionally, the doctrine is designed to protect against societal waste and to avoid the danger in allowing persons without an insurable interest to purchase insurance, because those persons might then intentionally destroy lives or property. *Id.* at 138. "To destroy life or property in order to receive insurance benefits is, to say the least, unproductive for a society." *Id.*

These purposes of the "insurable interest" doctrine would be ill-served by permitting the Gossetts to recover whatever insurance proceeds would be due based upon the value of the house at the time it was destroyed. They had no documented indebtedness. They would be placed in a far better position than they were before the fire. If we were to accept the well-after-the-fire execution of quit-claim deeds stating for "release of security" as establishing indebtedness for purchase of the property by the Gossetts, under the facts of this case our decision would be an incentive for insurance fraud and arson.

Nor is it an answer that the Gossetts paid insurance premiums. Where the ownership of the property belongs elsewhere, payment of insurance premiums on the property does not give rise to an insurable interest. 3 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 41:11, at 41-26 (3d ed. 1995).

The Gossetts also urge the court to consider their expectation of profit as evidence of an insurable interest. The Court of Appeals found a material issue of fact as to insurable interest in part because the Gossetts expected to buy the house, finish it, and make a profit selling it.

Initially, the policy involved here does not provide coverage for expected profits from a future sale of the insured property. Instead, the policy is a replacement cost policy which provides for coverage for the smaller of "the replacement cost of that part of the building damaged for equivalent construction and use on the same premises[,]" or "the amount actually and necessarily spent to repair or

replace the building intended for the same occupancy and use." CP at 15.

Moreover, the Gossetts' expectations do not constitute an insurable interest. This court has previously held that inchoate rights in expectation did not constitute an insurable interest where the expectation never materialized. *Tyree v. General Ins. Co.*, 64 Wn.2d 748, 751-52, 394 P.2d 222 (1964). In *Tyree*, the plaintiffs purchased a bakery business under a conditional sales contract and became sublessees in the bakery building, which was owned by the federal government. The plaintiffs obtained insurance covering the bakery equipment and fixtures, as well as the building. When legislation made it possible to purchase the government-owned property, the plaintiffs applied to purchase the building. Their application was denied. A fire then occurred which damaged the building. The plaintiffs had believed themselves entitled to a priority right to acquire the building and claimed an insurable interest in inchoate rights of expectation. Because those expectations never materialized, and were in fact foreclosed a month prior to the fire when a federal district court left standing the denial of their application to purchase the building, the court held that the plaintiffs lacked an insurable interest in the building.

Other courts have agreed that mere possession and expectation of ownership do not establish an insurable interest. For example, the court found no insurable interest where an individual was using a garage that had been conveyed to his wife under the terms of a divorce decree and expected to purchase it. Instead, the individual had only an expectancy and, consequently, did not have a risk of direct pecuniary loss by damage or destruction of the garage. *Anderson v. State Farm Fire & Cas. Co.*, 397 N.W.2d 416 (Minn. Ct. App. 1986); *see also Hane v. Hallock Farmers Mut. Ins. Co.*, 258 N.W.2d 779 (possession and expectation of ownership do not establish an insurable interest).

In this case, like the situation in *Tyree*, the Gossetts'

expectations of purchasing the property once they obtained long-term financing had not materialized at the time the fire occurred. The Gossetts' hopes and expectations of acquiring the property in the future are insufficient to constitute an insurable interest. At most, any such interest is akin to an option to purchase, and under an ordinary option contract prior to exercise of the option, "the optionee acquires no equitable estate or interest in the optioned land." *Robroy Land Co. v. Prather*, 95 Wn.2d 66, 71, 622 P.2d 367 (1980). Many courts have held that a mere option to purchase is insufficient to constitute an insurable interest. *E.g., Allstate Ins. Co. v. Thompson*, 164 Ga. App. 508, 297 S.E.2d 520 (1982); *Erie-Haven, Inc. v. Tippmann Refrigeration Constr.*, 486 N.E.2d 646, 650 (Ind. Ct. App. 1985); *St. Paul Fire & Marine Ins. Co. v. Daughtry*, 699 S.W.2d 321, 322-23 (Tex. Ct. App. 1985); *Harris v. North Carolina Farm Bureau Mut. Ins. Co.*, 91 N.C. App. 147, 370 S.E.2d 700 (1988); *Vendriesco v. Aetna Cas. & Sur. Co.*, 68 A.D.2d 946, 414 N.Y.S.2d 64 (1979). Where an option to purchase is contingent on occurrence of another event, courts have been even less inclined to find an insurable interest. *E.g., Christ Gospel Temple v. Liberty Mut. Ins. Co.*, 273 Pa. Super. 302, 417 A.2d 660 (1979); *Bartlett v. Allstate Ins. Co.*, 280 Mont. 63, 929 P.2d 227, 230-31 (1996). Even if the Gossetts had had an option to purchase, it would have been at best an option contingent upon their obtaining long-term financing and thus was insufficient to constitute an insurable interest. The Gossetts, however, do not claim they had even an option to purchase. All they had was an expectation. "[T]he mere possibility of an interest materializing, depending upon the occurrence of an uncertain event, will not give rise to an insurable interest."[3] Russ & Segalla, § 41.11, at 41-26.

The Gossetts also contend that because of their possession of the property, their improvements to the property,

---

[3]Further, there is no documentation in the record obligating Trusty Deed or Ms. Crennell to convey the property to the Gossetts if and when they acquired long-term financing.

their interest in its safety, and their continued efforts to secure long-term financing, they had an insurable interest in the property.

The trial court correctly held that the Gossetts had an interest in preserving the house from damage to the extent of the improvements they made because of their pecuniary loss resulting when those improvements were destroyed along with the rest of the house. *See* 4 JOHN A. APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 2131, at 49 (1969) (one who has built on the lands of another with the other's permission has an insurable interest in the improvements built). Improvements to property do not, however, entitle the party making the improvements to an insurable interest to the extent of the full replacement value of the property. Under the principle of indemnity discussed above, an insured with a partial interest in the property can generally recover only to the extent of that interest. *See City of Carlsbad v. Northwestern Nat'l Ins. Co.*, 81 N.M. 56, 463 P.2d 32 (1970); *see generally* 44 AM. JUR. 2D *Insurance*, §§ 1515, 1516 (1982). Otherwise, an insurance policy could too readily be used as a device to profit from destruction of property rather than as a contract of indemnification for a loss actually incurred. *See Harrington v. Agricultural Ins. Co.*, 179 Minn. 510, 229 N.W. 792, 794, 68 A.L.R. 1340 (1930). If improvements to a structure are all that is necessary to obtain an insurable interest in the replacement value of the entire structure, one could, for a small "investment," obtain a huge windfall.

As to possession of the property, the record does not show the Gossetts were purchasers entitled to possession because of a present purchase or an obligation to purchase the property in the future, nor does it show that they were lessees. They had not moved into the house at the time of the fire (though their sons stayed at the house at least some of the time to watch over things). The record is not clear why the Gossetts were allowed to make improvements to the property without any apparent legal obliga-

tions arising in connection with the property. However, to the extent they were in possession of the property, their interest in that possession is still insufficient to establish an insurable interest in the entire replacement value of the house. As Farmers points out, so far as the record shows Trusty Deed could have demanded that the Gossetts leave the premises at any time. Under such circumstances, the Gossetts did not have a sufficient pecuniary interest in continued possession of the property. *See, e.g., Boston Ins. Co. v. Beckett*, 91 Idaho 220, 419 P.2d 475 (1966) (where right to use a cabin could have been terminated at any time by individual's mother-in-law, the right to use the cabin was not a "substantial economic interest" within meaning of Idaho statute defining "insurable interest," using nearly the same definition as Washington's statute; thus, individual lacked insurable interest in cabin).

We conclude that in this case the trial court correctly granted summary judgment in favor of the Gossetts, while holding that their insurable interest is limited to the improvements they made to the property. Under the summary judgment standard, judgment should be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). In ruling on a motion for summary judgment, a court must apply the standard of proof which will apply at trial. *Sedwick v. Gwinn*, 73 Wn. App. 879, 885, 873 P.2d 528 (1994). As explained above, when property is conveyed by deed absolute in form, a party attempting to overcome the presumption that the transaction is what it appears to be on its face must do so by clear and convincing evidence. Where the evidence is less than clear and convincing, summary judgment may be granted. *See* 4 LEWIS H. ORLAND & KARL B. TEGLAND, WASHINGTON PRACTICE, RULES PRACTICE 550 (4th ed. 1992). The Gossetts have failed to present clear and convincing evidence sufficient to overcome the presumption that the conveyance of the property by a deed absolute in form from Mr. Gunns to Trusty Deed was an outright conveyance of the property. Further, as to other evidence presented, reasonable

minds could reach but one conclusion, i.e., that the Gossetts' insurable interest in the property extends only to the improvements they made. Accordingly, the trial court's order on summary judgment is affirmed. *See Ruff v. King County*, 125 Wn.2d 697, 704, 887 P.2d 886 (1995) (questions of fact may be determined as a matter of law when reasonable minds could reach but one conclusion).

The Gossetts' insurable interest is limited to the extent of the improvements they made to the property, as the trial court held.

▆ Finally, the Gossetts cross-appealed, contending that Farmers is estopped from denying coverage on the ground that Farmers did not tender return of premiums paid by the Gossetts. Tender back of premiums paid is a condition precedent to maintaining an action to rescind an insurance policy on the ground of fraud or misrepresentation. *Queen City Farms, Inc. v. Central Nat'l Ins. Co.*, 126 Wn.2d 50, 111-112, 882 P.2d 703 (1994), 891 P.2d 718 (1995) (Utter, J., dissenting) (majority opinion on this point). If the defrauded party elects not to rescind the contract, tender of payments is not required. *Id.* at 111. Farmers has not sought to rescind the insurance contract, and accordingly tender back of premiums would not be required even if Farmers alleged fraud or misrepresentation. Regardless, the issue we address here, Farmers' challenge to the nature and extent of the Gossetts' insurable interest, does not require tender back of premiums before assertion by Farmers.

## Attorney Fees

▆ An insured who prevails in a dispute over coverage is entitled to attorney fees from the insurer. *Olympic S.S. Co.*, 117 Wn.2d at 53. Farmers contends the *Olympic S.S. Co.* rule for awarding attorney fees violates equal protection and due process principles under the federal constitution. Farmers also maintains that the rule violates privileges and immunities and due process provisions of the state constitution, particularly in light of the state constitutional right of corporations to sue and be sued.

■ While it may be unusual for a judicially created rule to be challenged on constitutional grounds, this court, like the executive and legislative branches, is also subject to constitutional requirements. We have previously addressed, for example, a constitutional challenge to a court-adopted judicial canon. *In re Discipline of Blauvelt*, 115 Wn.2d 735, 741-43, 801 P.2d 235 (1990). We have also addressed constitutional challenges under the federal Equal Protection Clause and the state equal rights amendment to this court's judicially created common-law rule that husbands could recover damages for loss of consortium but wives could not, and held the rule violated both constitutional provisions. *Lundgren v. Whitney's, Inc.*, 94 Wn.2d 91, 614 P.2d 1272 (1980). " 'The courts should not perpetuate in the common law a discrimination that could not constitutionally be created by statute.' " *Id.* (quoting *Leffler v. Wiley*, 15 Ohio App. 2d 67, 69, 239 N.E.2d 235 (1968)); *see generally* 41 Am. Jur. 2d, *Husband and Wife* § 185 (1995) (common-law doctrine of necessaries has been held to violate state equal protection clauses); 41 Am. Jur. 2d *Husband and Wife* § 290 (common-law interspousal tort immunity has withstood a variety of constitutional challenges including equal protection and due process); 57 Am. Jur. 2d, *Municipal, County, School, and State Tort Liability* § 64 (1988)(common-law doctrine of state sovereign immunity enforced as a court-made or judicially recognized rule has been upheld against equal protection and due process challenges). Accordingly we address the constitutional arguments raised and apply the same constitutional analysis which applies when a legislative enactment is challenged.

As to the equal protection and privileges and immunities challenges, Farmers maintains the rule impermissibly discriminates between litigants who have an action against insurance companies and those who sue other entities because it permits an attorney fees award in the former case but not the latter. Insurance companies are thus exposed to attorney fees while noninsurance litigants are not. Farmers has engaged in a *Gunwall* analysis and

maintains the state privileges and immunities clause provides greater protection than the equal protection clause in this context. *See State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4TH 517 (1986).

An examination of the first two *Gunwall* factors shows that an analysis of the textual language of the state constitutional provision and a comparison of the federal equal protection clause and the state privileges and immunities clause are required. Farmers suggests that the text of the state provision and the differences in language of the two constitutional provisions favor independent state constitutional analysis. Farmers emphasizes that Const. art. I, § 12 (along with Const. art. XII, § 5) makes it clear that all citizens and, specifically, corporations share the same privileges and immunities and urges that the federal constitution provides for a less specific equal protection of the laws. We note again that while there are differences in the provisions, these differences do not compel an independent state analysis; indeed, "this court has repeatedly found these provisions substantially similar and treated them accordingly." *Seeley v. State*, 132 Wn.2d 776, 788, 940 P.2d 604 (1997) (citing cases). Corporations are clearly entitled to the same privileges and immunities as individual persons, but this does not explain *why* any *enhanced* protection should be considered under the state constitution. We are not persuaded by Farmers' further argument that because our state provision is like that of Oregon's, and Oregon courts analyze a privileges and immunities challenge differently from a federal equal protection claim, this means the second *Gunwall* factor favors an independent analysis of this state's privileges and immunities clause. We are not concerned in the first two *Gunwall* factors with how Oregon interprets its constitution. Although the differences suggest we should not foreclose the possibility that there may be a context where the state privileges and immunities clause should be independently examined, Farmers offers little in the way of persuasive argument as to the first two *Gunwall* factors.

The third factor involves examination of the state

constitutional and common-law history of the privileges and immunities clause. Farmers relies upon the history of attorney fees awardable in this state as set out in *State ex rel. Macri v. City of Bremerton*, 8 Wn.2d 93, 107, 111 P.2d 612 (1941) and the dissenting opinion in *Estate of Jordan v. Hartford Accident & Indem. Co.*, 120 Wn.2d 490, 508, 844 P.2d 403 (1993) (Andersen, J., dissenting). This *Gunwall* factor pertains, however, to the constitutional and common-law history of the constitutional provision at issue. *See Gunwall*, 106 Wn.2d at 61, 65-66; *Seeley*, 132 Wn.2d at 788. On this matter, the only history Farmers has addressed is *State v. Carey*, 4 Wash. 424, 30 P. 729 (1892), where the court separately addressed the constitutionality of a statute under the state privileges and immunities clause and under article 4, section 2 of the United States Constitution, securing to the citizens of each state the privileges and immunities of the several states, and the Fourteenth Amendment. The court did not, however, conclude that greater protection was provided under the state constitution's privileges and immunities clause than under the federal constitution. *Carey* has limited value in determining whether the state constitution should be considered as extending broader rights to state citizens than does the federal constitution.

The fourth factor concerns preexisting state law. "Previously established bodies of state law, including statutory law, may also bear on the granting of distinctive state constitutional rights." *Gunwall*, 106 Wn.2d at 61. The history of attorney fees is relevant to this factor. However, contrary to Farmers' claims, the history they rely on does not support an independent state constitutional analysis. Farmers reasons that historically this court has upheld the American rule on attorney fees, i.e., that each party bears its own attorney fees absent a recognized basis in contract, statute, or equity for requiring that attorney fees be paid by the other party. *E.g., State ex rel. Macri v. City of Bremerton*, 8 Wn.2d 93. Farmers maintains that preexisting state law thus favors equality of treatment on the issue of attorney fees. Farmers states the only equitable

grounds for an attorney fees award recognized prior to *Olympic S.S. Co.* were to punish a losing party who had acted in bad faith, to preserve a common fund, to protect constitutional principles, and to reimburse a party for private attorney general actions, citing *PUD No. 1 v. Kottsick*, 86 Wn.2d 388, 545 P.2d 1 (1976).

While it is true that the American rule as to attorney fees has prevailed as preexisting law in this state, we recently held that the *Olympic S.S. Co.* rule does not do violence to the American rule. Instead, "it is consistent with the long-standing rule that an award of fees may be based on recognized grounds of equity." *McGreevy v. Oregon Mut. Ins. Co.*, 128 Wn.2d 26, 35, 904 P.2d 731 (1995). We determined that the equitable remedy of attorney fees follows from the special fiduciary relationship existing between an insurer and the insured. *McGreevy*, 128 Wn.2d at 36; *see Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 715 P.2d 1133 (1986).

Because we have already determined that *Olympic S.S. Co.* fees are consistent with the American rule of attorney fees, we are unpersuaded by Farmers' apparent claim in this case that they are not. More to the point, for purposes of the *Gunwall* analysis, Farmers does not satisfactorily explain how application of the American rule in this state's history favors an independent analysis of the state constitution. The fourth *Gunwall* factor is concerned with previously established bodies of state law because such law may bear on the granting of distinctive state constitutional rights. *Gunwall*, 106 Wn.2d at 61. Rather than touching on distinctive state rights, the American rule has been a general rule having widespread application throughout the United States, as the many cases cited in *State ex rel. Macri v. Bremerton*, 8 Wn.2d 93, attest.

The fifth *Gunwall* factor addresses the structural differences between the state and federal constitutions. This factor always favors an independent state analysis. *Seeley*, 132 Wn.2d at 789-90. The sixth factor requires examining whether the subject matter is local in character or,

alternatively, whether there appears to be need for national uniformity. *Gunwall*, 106 Wn.2d at 62. An award of attorney fees in insurance litigation in this state's courts appears to be a matter of local concern as Farmers urges because there seems to be no need for national uniformity on the matter.

After examining the *Gunwall* factors and the arguments advanced by Farmers, we conclude that an independent state constitutional analysis is not justified in this case. Accordingly, we address the privileges and immunities challenge according to the analysis applicable under the federal equal protection clause.[4]

■■■■■ Under the equal protection clause, persons similarly situated with respect to the purposes of the law must receive like treatment. *State v. Blilie*, 132 Wn.2d 484, 493, 939 P.2d 691 (1997). Farmers does not show that it is either a member of a suspect class or that a fundamental right is at stake, nor does it establish the need for intermediate scrutiny. *See generally State v. Thorne*, 129 Wn.2d 736, 770-72, 921 P.2d 514 (1996). Thus, the rational relationship test applies. *Id.* at 771. Under the rational relationship test, a classification will be upheld unless it rests on grounds wholly irrelevant to the achievement of legitimate state objectives. *Id.* The burden is on the challenger to show that the classification is purely arbitrary. *Id.* A classification will be upheld against an equal protection challenge if there is any conceivable set of facts that could provide a rational basis for the classification. *Heller v. Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993). The rationality of a classification does not require production of evidence to sustain the classification; it is not subject to courtroom fact-finding. *Id.* "A clas-

---

[4]In briefing to the Court of Appeals, Farmers argued that the analysis used in applying the Oregon State Constitution's privileges and immunities provision should be followed in applying this state's privileges and immunities clause. Because we conclude that Farmers has failed to establish that an independent state constitutional analysis is appropriate in this case, we need not address this issue, nor do we need to consider whether that argument has been abandoned in this court.

sification does not fail rational-basis review because it " ' "is not made with mathematical nicety or because in practice it results in some inequality." ' " *Id.* at 321 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S. Ct. 337, 55 L. Ed. 369 (1911))).

■ The classification drawn by the rule consists of insurers who must pay attorney fees to their insureds because the insureds were forced to litigate coverage issues and prevailed in the litigation. We have already determined that the *Olympic S.S. Co.* rule is justified by the disparity in bargaining power in the relationship between an insurance company and the policyholder and the expectation of the policyholder that premiums are paid to avoid expensive litigation. *McGreevy v. Oregon Mut. Ins. Co.*, 128 Wn.2d 26, 35, 904 P.2d 731 (1995). In particular, we note that the insured's expectation arises because of the insurer-insured fiduciary relationship. *Id.* at 36, 37. Given these considerations, the *Olympic S.S. Co.* rule is a legitimate attempt to balance the one-sidedness of the ordinary insurer-policyholder relationship. *Id.* at 38. The rule serves this purpose because the potential for an attorney fees award encourages insurers to satisfy fiduciary obligations, including prompt payment of claims. We find no equal protection or privileges and immunities violations.[5]

Farmers' reliance on article XII, section 5 of the state constitution does not lead to a different result. It provides in relevant part that corporations have the right to sue and be sued the same as an individual person. Our analysis recognizes that Farmers is entitled to the same equal protection and privileges and immunities as an individual.

---

[5]Farmers has argued that a statute providing for attorney fees in a manner similar to the *Olympic S.S. Co. Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991) rule was held unconstitutional in *Jolliffe v. Brown*, 14 Wash. 155, 44 P. 149 (1896). We disagree with Farmers' assessment of *Jolliffe*. The statute there, which imposed attorney fees only on railroad company defendants, was struck down because it imposed a penalty which lacked any relationship to any duty of railroad companies.

Farmers also claims that due process guarantees are violated because *Olympic S.S. Co.* fees may be awarded without a hearing on the propriety of such an award. Farmers appears to suggest that for essentially the same reasons that an independent state constitutional analysis should be applied under the privileges and immunities clause, the state due process clause should also be examined independently. The state and federal due process causes are virtually the same, as Farmers concedes. In light of that fact, and in that the remainder of Farmers' arguments respecting the *Gunwall* factors in the privileges and immunities context are equally unpersuasive in the due process context, we examine the due process arguments using federal analysis.[6]

■■■ Farmers contends that a hearing is required to determine if the problems the rule is supposed to remedy in fact existed in a particular case. Farmers urges that, on a case-by-case basis, the insurer should be entitled to argue that it balanced the rights of the insured with competing societal interests, to show that it engaged in expeditious, inexpensive, "well-mannered" litigation and took no advantage of any difference in wealth or power, or that it offered a fair settlement rejected by the insured. Supplemental Br. of Pet'r at 22.[7]

Farmers, of course, has had an opportunity to be heard on the question whether the Gossetts are entitled to *Olympic S.S. Co.* attorney fees. It is not entitled to the case-by-case assessment for which it argues. As noted, the rationality of a classification is not subject to courtroom fact-finding. *Heller,* 509 U.S. at 320. When examining whether legislation (or here, a judicially created equitable

---

[6]We note that, in any event, Farmers has not suggested an alternative state due process analysis.

[7]To the extent Farmers' brief to the Court of Appeals might be read as raising due process arguments which it does not argue in briefing to this court, the arguments have been abandoned. *See State v. Myles,* 127 Wn.2d 807, 817 n.4, 903 P.2d 979 (1995) (argument made to the Court of Appeals abandoned in this court); *Havens v. C&D Plastics, Inc.,* 124 Wn.2d 158, 169 n.3, 876 P.2d 435 (1994) (same).

rule) is rationally related to legitimate state goals, the challenging party " 'must show, beyond a reasonable doubt, that no state of facts exists or can be conceived sufficient to justify the challenged classification, or that the facts have so far changed as to render the classification arbitrary and obsolete.' " *Seeley*, 132 Wn.2d at 795-96 (quoting *State v. Smith*, 93 Wn.2d 329, 337, 610 P.2d 869 (1980)). Under the rational basis test the means employed to achieve the state goal need not be the best way to achieve the goal. *Heller*, 509 U.S. at 321; *Seeley*, 132 Wn.2d at 795. It follows that assessing on a case-by-case basis the rationality of the classification to which the *Olympic S.S. Co.* rule applies is simply not required to uphold the constitutionality of the rule. Because Farmers is not entitled to be heard on the question whether the rule's aims are factually achieved in every case, there is no due process violation resulting from denying it the opportunity to be heard on the matter.

Finally, Farmers suggests in its Petition for Review that it is entitled to an opportunity to be heard on the propriety of fees in a given case because the case may be one involving a novel coverage issue or one where the insured does not prevail on all issues. As to the former, the insurer must necessarily assess whether to risk losing on a coverage issue. As to the latter, nothing about the *Olympic S.S. Co.* rule precludes limiting attorney fees to those expended on coverage issues on which the insured prevailed. Neither of these concerns compels a hearing to satisfy due process concerns.

Farmers also contends that an award of *Olympic S.S. Co.* attorney fees in this case conflicts with *Dayton v. Farmers Ins. Group*, 124 Wn.2d 277, 876 P.2d 896 (1994). Farmers maintains the court held in *Dayton* that *Olympic S.S. Co.* fees may not be awarded when there is a legitimate difference of opinion on a matter which varies with the facts of the particular case. Farmers misreads *Dayton*. We held in *Dayton* that the *Olympic S.S. Co.* rule applies only to disputes over coverage, and not to disputes over

the amount of a claim. *Id.* at 280-81. Here, Farmers contended that the Gossetts had no coverage for the house or at the most had coverage only for improvements they made. Thus, coverage was disputed, and the trial court properly awarded *Olympic S.S. Co.* attorney fees to the Gossetts for their expenses of establishing coverage. The Court of Appeals also properly awarded *Olympic S.S. Co.* attorney fees on appeal. *See* RAP 18.1; *Olympic S.S. Co.,* 117 Wn.2d at 53. Farmers has not challenged the amount of the award.

The Gossetts request attorney fees in this court pursuant to RAP 18.1 and *Olympic S.S. Co.* Pursuant to RAP 18.1(f), the Commissioner of this court is directed to award attorney fees to the Gossetts for their expenses involved in defending their right to coverage for improvements made to the property.

The Court of Appeals is reversed in part and the judgment of the trial court is reinstated.

DURHAM, C.J., and DOLLIVER, SMITH, JOHNSON, ALEXANDER, and SANDERS, JJ., concur.

TALMADGE, J. (concurring) — While I concur in the majority's resolution of the issue pertaining to the Gossetts' insurable interest in the property, I disagree with its application of a constitutional analysis to a common-law rule, particularly one adopted pursuant to our equitable power. In *Olympic S.S. Co., Inc. v. Centennial Ins. Co.,* 117 Wn.2d 37, 811 P.2d 673 (1991), and *McGreevy v. Oregon Mut. Ins. Co.,* 128 Wn.2d 26, 904 P.2d 731 (1995), we adopted an additional equitable exception to the American rule on attorney fees where an insurance carrier breached its duty to indemnify an insured. *Olympic S.S.* and *McGreevy* control in this case.

Neither the majority nor Farmers cites authority for the view we must engage in a constitutional review of a previously announced common-law equitable decision of the Washington Supreme Court, whether on due process

or equal protection grounds. Such a contention borders on the frivolous, and merely opens each common-law ruling a Washington court may make to an additional round of unneeded litigation.

While it goes without saying we are not free to act in disregard of either the federal or state constitutions, it also should go without saying our announcement of common-law rules ordinarily subsumes any constitutional considerations that may exist. It is difficult to see how Farmers can believe it was deprived of due process, procedural or substantive, when we announced our decisions in *Olympic S.S.* and *McGreevy.*

Similarly, it is difficult to discern how Farmers was deprived of equal protection of the law. We decided in the *Olympic S.S./McGreevy* line of cases to award attorney fees as an equitable matter to policyholders who have to sue to obtain the benefits of their policy coverage. I cannot conceive of what useful task the majority would set for us in a constitutional analysis of the *Olympic S.S./McGreevy* holdings or any other common-law rule. Must we now, years later, emptily recite we had a "rational basis" for our decision simply because a new opponent of the *Olympic S.S./McGreevy* rule raises an equal protection challenge?[8] Our quintessential function is to make decisions on a rational basis, although, of course, there may always be those who claim in every case we have not done so. Mere disagreement with an outcome does not give rise to a constitutional challenge, however.

---

[8]Strict scrutiny applies when the allegedly discriminatory classification affects a suspect class or threatens a fundamental right. Intermediate scrutiny applies in the limited circumstances where the law affects important rights or semi-suspect classifications. The rational basis test applies where the statutory classification does not involve a suspect or semi-suspect class and does not threaten a fundamental right. *State v. Heiskell*, 129 Wn.2d 113, 123-24, 916 P.2d 366 (1996). Farmers suggests intermediate scrutiny is the appropriate standard of review for its equal protection claim because the "right to be indemnified for personal injuries is a substantial property right." Br. of Appellant at 35. But Farmers' right to be indemnified for personal injuries is not at stake in this case. Farmers does not claim membership in a semi-suspect or suspect class, or that it has any fundamental rights at stake. Thus, the rational basis test would be appropriate in this case were there is a need for an equal protection analysis.

In its classic formulation, equity is an exception to a principle of law and is designed to do justice in an appropriate case. Farmers' attempt to apply a constitutional analysis to an equitable principle is a significant attack on the inherent power of the Court to do equity, and is fraught with potential for mischief.

The majority's approach to this issue is unprecedented and unwarranted. We should not open the door to this kind of collateral attack on our common-law rulings.[9] I would reject Farmers' claim without reaching the merits because we adhere to the *Olympic S.S./McGreevy* rule.

GUY, J., concurs with TALMADGE, J.

Reconsideration denied February 6, 1998.

---

[9]A party is, of course, always free in our common-law system to ask us to revisit a common-law rule and to repeal or reshape such a rule. Constitutional grounds may be advanced for such a request. *See Lundgren v. Whitney's Inc.*, 94 Wn.2d 91, 96, 614 P.2d 1272 (1980) (Court abandoned common-law rule that wife had no cause of action for loss of consortium when husband was injured, noting that such a rule could violate equal protection or Washington's Equal Rights Amendment principles because a husband had such a cause of action for injuries to his wife).