1998-NMCA-058

958 P.2d 111

David HUBBARD d/b/a D.A.L.T. Trucking
Co., Plaintiff–Appellant,

v.

ALBUQUERQUE TRUCK CENTER,
LTD., a Wisconsin Corporation,
Defendant–Appellee.

No. 17716.

Court of Appeals of New Mexico.

March 18, 1998.

**154**

Martin Lopez, III, Martin Lopez, III, A Professional Corporation, Albuquerque, for Plaintiff-Appellant.

Hal Simmons, Albuquerque, for Defendant-Appellee.

## OPINION

BUSTAMANTE, Judge.

{1} This case provides an opportunity to analyze, among other issues, the measure of damages which should be applied when an item of personal property is improperly repaired by a party who was contracted to undertake such repair.

{2} Plaintiff David Hubbard (Hubbard) filed his Complaint for Breach of Contract and Warranties, Misrepresentation, Negligence, Negligence Per Se and Unfair Trade Practices against the Defendant Albuquerque Truck Center, Ltd. (ATC) and Cummins Southwest, Inc. (Cummins) asserting ATC had failed to properly conduct an inframe overhaul of the engine in his Kenworth semi-tractor. Hubbard asserted that Cummins had assisted ATC, to no avail, in diagnosing defects in the repair work. Cummins settled its differences with Hubbard for the sum of $4500, but the matter proceeded to a bench trial against ATC. The trial court found in favor of Hubbard on his breach of contract and breach of warranty claims, but found against him on his misrepresentation, negligence, negligence per se, and unfair trade practices theories. Hubbard appeals from the judgment asserting three points of error: (1) the apparent decision of the trial court to limit his general damages to the fair market value of the tractor if properly repaired, as of October 1993; (2) the trial court's refusal to award any damages for loss of income or other consequential damages; and (3) the trial court's refusal to find a violation of the Unfair Trade Practices Act, NMSA 1978, Sections 57–12–1 to –22 (1967 as amended through 1995). We affirm as to points one and three, but reverse as to point two.

### FACTS AND PROCEEDINGS

{3} Hubbard owns a 1983 Kenworth semi-tractor. Prior to October 1993, Hubbard earned his living operating the tractor as an independent hauling contractor. In July 1992, when the tractor had approximately 800,000 miles on it, Hubbard noticed that the engine was leaking water and was using too much oil. He took the tractor to ATC for repairs. Hubbard chose to have a complete inframe overhaul of the engine performed at a cost of $6,296.39, ATC warranted the engine and its repairs for one year and/or 100,000 miles from the time the service was performed.

{4} Within two days after placing the tractor back in service after the repairs, Hubbard observed excess water leaking from both sides of the engine block. He immediately returned the tractor to ATC for further repairs. Hubbard was asked to return at a later date because the mechanic who had

performed the overhaul was unavailable. Additional repairs, including removal of the center cylinder head, started on August 17, 1992, but were unsuccessful. Hubbard returned the tractor to ATC on September 24, 1992, twice in October 1992, and again in November 1992 for unsuccessful repair efforts by ATC. At one point, ATC tore down the engine a second time and rebuilt all of the cylinders, without success. The engine continued to leak excessively, despite ATC's repair efforts, including consultations with Cummins repair personnel.

{5} After six attempts to fix the water leak, ATC advised Hubbard that there was something unusual about the engine, and that it was uneconomical for both parties to keep rebuilding it, ATC offered to give Hubbard full credit for the amount he paid for the overhaul as part payment for another reconditioned engine. Hubbard refused the suggestion.

{6} In December 1992 Hubbard again contacted ATC regarding the water leak. This time ATC refused to inspect or attempt further repairs on the tractor. Hubbard continued to drive the tractor unrepaired, accumulating over 80,000 miles on it, until October 1993 when a head bolt broke on the engine. Breakage of the head bolt was unrelated to the water leakage problem. Hubbard decided not to repair the head bolt and, so far as the record reveals, he had not repaired it through the date of trial.

{7} An inspection by another repair shop revealed that the water leaks were probably caused by uneven grinding of the engine block surface which prevented the head gaskets from seating properly. The inspector testified that the depressions were fairly sizeable and could have been detected by laying a straight edge across the engine block. In addition, some of the cylinder block liners were incorrectly positioned. Hubbard was told that continued use of the tractor in its condition would cause irreparable harm to the engine. He received an estimate for repairs of the engine in its current condition, or replacement, in the range of $10,000 to $12,000.

{8} It is undisputed that the tractor was in ATC's shop in Albuquerque for repairs for at least twenty days from August to November 1992. While the tractor was in the shop, Hubbard could not work or earn income from it. In addition, it is undisputed that Hubbard incurred some unreimbursed expenses for lodging and meals while in Albuquerque for the repairs. ATC paid some, but not all of these per diem costs.

{9} In his requested findings of fact and conclusions of law, Hubbard requested damages as follows:

35. Hubbard's gross income for the year 1992 was $93,348. Hubbard's gross income for the year 1993 was $61,461 for three quarters of the year through breakdown of his tractor. He had wages of $5,550 through the last quarter of 1993 since he was unable to operate his tractor.

36. Hubbard's damages are as follows:

| a. | repair/replace engine: | $10,000.00–12,000.00 |
|---|---|---|
| b. | repair costs: | $ 100.22 |
| c. | lost income (1992) (20 days × 350.00): | $ 7,000.00 |
| d. | per diem: (motels/meals): | $ 800.00 |
| e. | loss of earnings: (1993) | $26,337.00 (inclusive of wages) |

{10} Relying on UJI 13–1815 NMRA 1998, ATC argued that Hubbard's general damages, if any, should be limited as follows:

A. Hubbard is entitled to the smaller of the two figures which are calculated as follows:

One figure is the reasonable expense of necessary repairs to the property damage[d] plus the decrease, if any, in the fair market value of the repaired property as compared to its fair market value before the occurrence; (_____, Repair figure chosen by Court) and,

The other figure is the difference between the fair market value of the property immediately before the occurrence and the fair market value of the unrepaired property immediately after the occurrence. (UJI 13–1815) (This amount is *$7,500,* being the $11,000 less the $3,500 salvage value of the truck).

In addition, ATC requested a finding that Hubbard was entitled to the "reasonable rental of similar property used during the time reasonably required for the repair of

the damaged property. (A $110 rental per day for 24 days, or $2,640[.])"

{11} The trial court entered findings agreeing that ATC had verbally and expressly warranted that the repairs to the tractor would be performed in a workmanlike manner consistent with industry standards. The trial court further found that despite ATC's good faith efforts to repair the water leak problem it did not fix the problem, and that ATC breached its contract with Hubbard causing Hubbard damage. Calculating Hubbard's damages, the trial court concluded:

19. Hubbard sustained no loss of income as a result of the truck repair problems.

20. The fair market value of Hubbard's 1983 Kenworth truck in 1993 was $11,000, assuming it was operable and in average condition. The salvage value of the same truck, in its present "as is" condition is $3,500.

21. Hubbard has received the sum of $4,500 from Cummins Southwest, Inc. for the same leaking water problem.

22. Hubbard's damages are in the amount of $3,400 after a set off of $4,500 received from co-defendant Cummins Southwest, Inc.

### GENERAL DAMAGES

{12} Citing the general rubric that the purpose of an award of damages is to make the injured person whole, Hubbard argues he should have been awarded a sum sufficient to properly repair the engine currently in his tractor: between $10,000 and $12,000, minus his settlement with Cummins. In essence, Hubbard asks that his expectancy interest—having his original engine properly repaired—be compensated in full by measuring his damage at an amount of money necessary to have the repair successfully completed by someone else. Hubbard relies primarily on *Louis Lyster, General Contractor, Inc. v. Town of Las Vegas,* 75 N.M. 427, 430, 405 P.2d 665, 668 (1965), a construction contract case in which our Supreme Court described the measure of damages as the "difference between the contract price and the cost to the plaintiff of having another complete the work." In addition, Hubbard

relies on *Fredenburgh v. Allied Van Lines, Inc.,* 79 N.M. 593, 597, 446 P.2d 868, 872 (1968) for the proposition that "cost of repairs alone may be used in cases where the damaged goods can be entirely repaired, bringing the value up to its pre-damage level[.]" Hubbard is thus arguing for a substitution cost measure of damages.

{13} Relying on *Fredenburgh,* UJI 13–1814 NMRA 1998, *Hale v. Basin Motor Co.,* 110 N.M. 314, 319, 795 P.2d 1006, 1011 (1990), and cases from other jurisdictions, ATC argues that because the repair cost here exceeds the value of the tractor, the trial court appropriately limited damages to the fair market value of the tractor. ATC's argument boils down to an assertion that paying Hubbard his substitution cost is economically wasteful because requiring it to pay more than the tractor is worth would impose a cost on ATC which would not produce a corresponding benefit to Hubbard.

{14} Here, the trial court used a market value differential to measure Hubbard's damages. Hubbard's argument is that the trial court's use of this measure is legally erroneous because the measure does not give him the benefit of his bargain or fulfill his reasonable expectation interest. On first blush, Hubbard's method of measuring his damages seems to be supported not only by *Fredenburgh* and *Lyster,* but also by UJI 13–847 NMRA 1998, which describes a buyer's contract remedy as the "difference between the contract price and the reasonable cost to [plaintiff] of a substituted performance." However, as Professor Dobbs observes,

> Very difficult remedial decisions must be made when two or more remedies will each provide appropriate redress of the plaintiff's entitlement but one of them will entail onerous costs to the defendant or economic waste. In general we wish to fully redress the plaintiff's rights, but at the same time we wish to count the costs. Remedies that cost more than the benefits they produce are suspect.

1 Dan B. Dobbs, *Dobbs Law of Remedies* § 1.7, at 33 (2d ed.1993) (hereinafter *Dobbs* ).

[redacted] {15} We, of course, agree that "damage awards should provide full and just compensation for the injured party." *Camino Real Mobile Home Park Partnership v. Wolfe,* 119 N.M. 436, 443, 891 P.2d 1190, 1197 (1995). Full and just compensation is synonymous with the concept of making the injured person whole. *See Hood v. Fulkerson,* 102 N.M. 677, 680, 699 P.2d 608, 611 (1985). This statement is also synonymous with Corbin's formulation describing the goal of damages for breach of contract as putting the "injured party in as good a position as he would have had if performance had been rendered as promised." 5 Arthur L. Corbin, *Corbin on Contracts* § 992 (1964).

[redacted] {16} While these formulations can be useful in evaluating the utility or success of alternative remedies, they do not answer the specific issues before us: whether it is proper to limit a general damage award for failure to properly repair personal property to the fair market value of the property.

[redacted] {17} We believe New Mexico has already decided the issue against Hubbard's position. Where circumstances permit application of alternative measures, New Mexico cases have been careful to limit personal property damage awards to the measure which yields the smaller award. For example, in *Fredenburgh,* a breach of contract action involving household goods damaged by a transport company, the court stated that plaintiff would be limited to the lesser of repair costs (plus diminution in value) or the difference in market value of the goods damaged and undamaged. 79 N.M. at 596–97, 446 P.2d at 871–72. *Hale,* a fraud and unfair trade practices act case, is to the same effect. In *Hale,* defendant sold a car as a "new demonstrator" when in fact it had been in a collision and had been repaired by the defendant prior to its sale to the Hales. The Hales claimed the cost of repairs as general damages. Our Supreme Court stated:

> One's right to recover the cost of repairs, however, is limited. The cost of repairs must be compared to the *difference* between the fair market value of the property *before and after the damage* took place. A party can recover only the smaller of these amounts, the cost of repairs or the differential.

110 N.M. at 319, 795 P.2d at 1011. After determining that the trial court had incorrectly calculated the fair market value differential, the Supreme Court awarded the Hales the cost of repair because that amount was smaller than the difference between the fair market value of the vehicle before and after the damage.

{18} These decisions are reflected in New Mexico's Uniform Jury Instructions. *See* UJI 13–1812 to –1818 NMRA 1998. These instructions are written to encompass the great majority of circumstances courts are likely to encounter when dealing with personal property damage. UJI 13–1812 sets a fair market value as the measure of damages for property which has been completely destroyed and has no salvage value, while UJI 13–1814 describes a market value differential standard to be used when there is some salvage value and the market measure is less than the cost of repair. UJI 13–1813 allows cost of repair as the measure when it is "admittedly" less than the decrease in the property's market value. *See* Directions for Use, UJI 13–1815 and 13–1816. UJI 13–1815 allows award of the lesser of (1) repair costs plus depreciation after repairs, and (2) the decrease in market value before and after the damage, assuming no repairs. UJI 13–1816 uses the same measure as UJI 13–1815, but assumes there has been no depreciation as a result of the damage after repair.

{19} Here, the trial court's approach to measurement is supported by UJI 13–1814 and 13–1815. The testimony that repair costs equaled or exceeded the fair market value of the tractor supports a decision that the vehicle was a total loss, but had a salvage value. Thus, the trial court's award of the difference between fair market value, less salvage value and the amount of the Cummins settlement, should be affirmed unless there are circumstances making this measure so inadequate as to make it unreasonable.

[redacted] {20} Are there such circumstances present in this case? We do not believe so. First, we note that the warranty in this case did not specify the measure of damages. As

to the terms of the warranty, the trial court made the following, unchallenged finding: "ATC verbally and expressly warranted that the repairs to the tractor would be performed in a workmanlike manner consistent with workmanship suitable for the industry." Additionally, Hubbard testified that he chose the ATC warranty over alternative warranty terms offered by Cummins. Ordinarily, where the terms of a contract are freely agreed upon by the parties, the duty of the courts is to enforce the contract. *Nearburg v. Yates Petroleum Corp.*, 1997–NMCA–069, ¶ 31, 123 N.M. 526, 943 P.2d 560. Under the circumstances presented here, where the warranty term contracted for by the parties was *silent* as to how damages were to be calculated, we see no reason to adopt Hubbard's damage theory in the face of prior New Mexico precedent.

{21} Second, it is not significant from a damages standpoint that this can be characterized as a breach of contract action. Whether recovery is premised on tort or contract theories, the objective of the damage award is the same: full compensation for the injured party. Once the Plaintiff "establishes a right to compensatory damages, ... the amount of the plaintiff's award is determined in the same way regardless of the legal theory under which the plaintiff recovers." *Central Sec. & Alarm Co. v. Mehler*, 1996–NMCA–060, ¶ 17, 121 N.M. 840, 918 P.2d 1340. Thus, we need not explore whether a breach of warranty arising from repair of personal property is more like a tort or more like a contract.

{22} Third, this case does not fit the pattern of those cases allowing repair costs which exceed the value of the property or the amount of decrease in the value of the property. Broadly characterized, these cases usually involve damages to real property or damage to property which is difficult to replace or value and which is engaged in income producing activity.

{23} An example of the latter situation is *Spreader Specialists, Inc. v. Monroc. Inc.*, 114 Idaho 15, 752 P.2d 617 (1987). There, an oil spreader was diminished in value by the sum of $34,500 as a result of damage caused in a collision. Repair costs totaled $40,500.

The court affirmed a judgment for the full repair costs primarily because it found that the vehicle was in use on a project and would have been difficult to replace. Expenditure of the repair costs was reasonable in order to put the truck back in service quickly, thereby helping to avoid other consequential damages flowing from delay in the construction project. The repair costs were reasonable as a means of minimizing total damages. Neither rationale applies here. The record does not reveal anything unique or specialized about Hubbard's tractor. Since Hubbard did not attack the fair market value for similar tractors established by ATC, we must assume the tractor was essentially fungible; that is, reasonably subject to replacement by any number of other vehicles of similar age and service for $11,000. Neither was there any testimony or argument that full repair costs were necessary to otherwise minimize Hubbard's consequential damages.

{24} Of course, this case does not involve damages to real property, and the rules applicable in such cases do not apply here directly. That is reason enough not to make strenuous efforts to make the real property measure fit Hubbard's claim. However, it is worth noting that even in the real property cases, the idea of economic waste and unreasonable expense come into play as a limit on damages. UJI 13–850 NMRA 1998 allows the reasonable cost of completing unfinished construction or correcting deficient work as the normal measure of damages. The jury instruction thus reflects substitution costs as the usual or preferred measure of damages in such cases. The instruction also provides a market value measure to be applied, according to the Directions for Use, "only where completion of the contract would involve unreasonable waste of money ." The instruction comports with our Supreme Court's formulation in *Camino Real Mobile Home Park Partnership*, 119 N.M. at 444, 891 P.2d at 1198, that the measure of warranty damages on real property

is the cost of repairs required to bring the property into compliance with the warranty or, if the cost of repairs or replacement involves economic waste, the measure is the difference between the reasonable

market value of the subject property as warranted and its reasonable market value in its actual condition.

*See also Jacob & Youngs, Inc. v. Kent,* 230 N.Y. 239, 129 N.E. 889, 891–92 (N.Y.1921); *Dobbs, supra* §§ 3.2, 3.3, and 12.19(1).

{25} Fourth, we are not convinced the trial court's award is so inadequate that other measures must be used to avoid an injustice. *See* Restatement (Second) of Contracts § 347 cmt. a (1979) ("In other situations the sum awarded cannot adequately compensate the injured party for his disappointed expectation as, for example, where a delay in performance has caused him to miss an invaluable opportunity."). As already noted, the record supports a conclusion that the tractor could have been replaced with the money awarded when combined with the Cummins settlement and the salvage value of the vehicle. The effect of the trial court's award was to return to Hubbard all of the money he had paid ATC, plus an additional amount, thus allowing him to sell the truck for salvage and replace it. This suggests that the measure used by the trial court provided a practical, workable solution to Hubbard's problem. This is a common sense evaluator for any court-imposed remedy. Absent any evidence in the record of any aspects of the vehicle which made it uniquely valuable to Hubbard, the trial court was not required to search for ways to recompense purely idiosyncratic valuations of the property.

{26} Finally, New Mexico's approach to measuring the remedy for personal property damages is in line with case authority from other states. The great majority of states rely on the same measure we have described above: repair costs plus depreciation or reduction in market value, whichever is less. *See Rector v. Larson's Marine, Inc.,* 479 So.2d 783, 785–86 (Fla.Dist.Ct.App.1985) (contract action for repair of boat); *Williams v. Louisiana Machinery Co.,* 387 So.2d 8, 12 (La.Ct.App.1980) (repeating three-part test for measure of damages, but noting that the rule should not be applied merely mechanically); *Southwick v. Ace Auto Body Shop, Inc.,* 646 S.W.2d 401, 403 (Mo.Ct.App.1983) (repair of personal automobile); *Hutson v.*

*Cummins Carolinas, Inc.,* 280 S.C. 552, 314 S.E.2d 19, 23 (1984) (repair of Kenworth truck); *see generally* Debra T. Landis, Annotation, *Measure and Elements of Damages in Action Against Garageman Based on Failure to Properly Perform Repair or Service on Motor Vehicle,* 1 A.L.R.4th 347 (1980).

{27} There are cases which describe the general or preferred measure of damages as the cost of repair. *See. e.g. Simmons v. Boros,* 255 Ga. 524, 341 S.E.2d 2, 3 (1986). As a minority position, the statement in *Simmons* can be seen as an overreaction to the overtechnical application of a market-based measure imposed in *General GMC Trucks, Inc. v. Crockett,* 145 Ga.App. 503, 244 S.E.2d 78, 79–80 (1978) (holding that plaintiff had failed to meet its burden of proof when it presented only repair costs and did not prove the pre-damage value of the car). *Simmons* does not discuss what rule might apply if repair costs exceeded the value of the vehicle. The court was concerned that a market-based measure would not adequately cover cases involving faulty repairs of vintage automobiles. While this is a valid concern, we question whether this relatively specialized problem is sufficient to turn our backs entirely on the prevalent market-based approach New Mexico has already adopted. Our case law on damages is not written in stone. We are confident New Mexico law is sufficiently flexible to fashion adequate remedies in situations involving rare, antique or otherwise difficult to replace or repair items. Such an item is not involved here.

### CONSEQUENTIAL DAMAGES

{28} New Mexico normally allows recovery of consequential or incidental damages which can be reasonably related to the defendant's breach. In a personal property damage case, consequential damages are based on benefits that could have been produced or those losses suffered as a result of the absence of the damaged item. *See Camino Real Mobile Home Park Partnership,* 119 N.M. at 443, 891 P.2d at 1197; *cf. Cress v. Scott,* 117 N.M. 3, 6, 868 P.2d 648, 651 (1994). In *Cress,* our Supreme Court allowed assessment of damages for loss of use of an automobile—equal to the fair rental value of an-

other vehicle—even though plaintiff had not actually rented another car and even though the vehicle was not normally used for commercial purposes. *Id.,* 117 N.M. at 6, 868 P.2d at 651. The Court held that the loss of use of the vehicle pending repairs was a compensable loss in all vehicle damage cases. *Id.*

{29} Here, Hubbard presented evidence of, and requested damages for, time spent idle while his tractor was in ATC's shop being analyzed ($350 per day times 20 days = $7000). He also requested damages for his unreimbursed per diem expenses ($375 motel expenses over 15 days plus $300 meal expenses over 20 days). In apparent recognition of the holding in *Cress,* ATC also requested a finding of consequential damages based on a rental value for similar tractors.

{30} The trial court found that Hubbard had suffered no lost income as a result of the down time. In addition, the trial court refused all requested findings seeking damages for per diem expenses and the rental value of the vehicle. We hold that the trial court's decision in this regard is not supported by substantial evidence. *See State ex rel. Concrete Sales & Equip. Rental Co. v. Kent Nowlin Constr., Inc.,* 106 N.M. 539, 542, 746 P.2d 645, 648 (1987) ("A trial court's finding ... which has been challenged and is not supported by substantial evidence cannot be sustained on appeal."). With regard to lost income, there was evidence admitted which could not simply be ignored. Twenty days of down time for an independent trucker who earns income from being on the road will likely result in some expenses and lost income, and there was evidence to that effect. There was no evidence to the contrary. Given the circumstances of this case, the amount of lost income could be calculated on some reasonable daily rate or could be tied to the reasonable rental value of a similar vehicle. Both figures are approximations of the value of the loss of use of the tractor. We, of course, do not dictate to the trial court the best method to calculate Hubbard's loss. We only note that zero dollars is not within the evidence in this case and reflects a misapprehension of the proper measure of damages as a matter of law.

{31} To the extent the trial court may have compared Hubbard's income after he became an employee in October 1993, with his income from August 1992 to October 1993, the comparison was incorrect. It is irrelevant that Hubbard may have earned more money later on, as an employee, than he would have earned as an independent contractor. That increased income negates any damages for that *later* period of time. However, before he obtained this job, it is undisputed that Hubbard spent so many days without a job and unable to earn money on the road while incurring expenses, and it is that period for which Hubbard is entitled to damages. Those damages are not offset or negated by whatever may have occurred thereafter.

{32} We therefore reverse and remand to the trial court to reconsider Hubbard's lost income, loss of use, and per diem damages.

## UNFAIR TRADE PRACTICES ACT CLAIM

{33} Hubbard asserts generally that the court erred in refusing to find that ATC violated the Unfair Trade Practices Act. Hubbard's claim presents an issue of substantial evidence. We will not reverse the trial court's finding unless there is insufficient evidence to support its decision. *Strata Prod. Co. v. Mercury Exploration Co.,* 1996–NMSC–016, 121 N.M. 622, 627, 916 P.2d 822, 827.

{34} Hubbard presented persuasive evidence that the repair work by ATC was not correctly accomplished. The trial court agreed with him and found that ATC's work did not meet the standard of workmanship for the industry and that there had been a breach of ATC's warranty of good workmanship. The trial court also found, however, that ATC exerted good faith efforts to correct the problem, albeit unsuccessfully. These findings are supported by substantial evidence which has already been outlined in this opinion.

{35} It cannot be doubted that ATC's repair efforts were unsuccessful. However, the mere fact of a bad result does

not require a finding that ATC acted in violation of the Unfair Trade Practices Act. The trial court did not find any "false or misleading ... statement ... or other representation of any kind knowingly made." Section 57–12–2, which is supported by substantial evidence. The presence of evidence to the contrary does not compel reversal.

## CONCLUSION

{36} We affirm the trial court with regard to its award of general damages and in regard to its decision on Hubbard's Unfair Trade Practices Act claim. We reverse the trial court with regard to Hubbard's lost income, loss of use and per diem damages and remand for reconsideration of those items in accordance with this Opinion. Hubbard is awarded his costs on appeal.

{37} **IT IS SO ORDERED.**

DONNELLY and BOSSON, JJ., concur.