1999-NMCA-109

985 P.2d 1183

**TEAGUE–STREBECK MOTORS, INC.,**
**and Sidney Strebeck, Plaintiffs–**
**Appellees–Cross Appellants,**

v.

**CHRYSLER INSURANCE COMPANY,**
Defendant–Appellant–Cross
Appellee.

No. 18,684.

Court of Appeals of New Mexico.

March 8, 1999.

On Motion for Rehearing June 10, 1999.

Certiorari Denied, No. 25,827, July 27, 1999.

604

Brian P. Brack, Clovis, Ron Morgan, Shannon A. Parden, Ron Morgan, Attorney, Lim-

ited, Albuquerque, for Plaintiffs-Appellees-Cross Appellants.

Sarah M. Singleton, Carolyn A. Wolf, Montgomery & Andrews, P.A., Santa Fe, Corbin Hildebrandt, The Roehl Law Firm, P.C., Albuquerque, Edward D. Chapin, Gregory S. Tavill, Chapin, Fleming & Winet, San Diego, CA, for Defendant–Appellant–Cross Appellee.

## OPINION

HARTZ, Chief Judge.

{1} This is another in a seemingly endless stream of cases in which an insurance agent has promised more coverage than is provided in the policy. The insurance at issue in this case was for an automobile dealership about to be purchased from a bankrupt corporation. A fire destroyed dealership property and some customer vehicles on the premises. One matter not contested on this appeal is whether the insurer, Chrysler Insurance Company (Chrysler), is bound by the representations of its agent. But there remains a good deal to argue about. On appeal Chrysler contends that (1) the district court erred in adding Mills–Strebeck Autoplex, Inc. (Mills–Strebeck), as a plaintiff after expiration of the limitations period set forth in the insurance contract, (2) the district court erred in awarding damages for bad faith handling of the insurance claim, (3) Mills–Strebeck did not have an insurable interest in the destroyed property, and (4) the award was excessive because it did not take into account the economic interests of third parties in the property. In addition, the Plaintiffs, Teague–Strebeck Motors, Inc. (Teague–Strebeck), and Mills–Strebeck, have cross-appealed. They contend that the district court erred (1) in awarding damages based on the actual cash value of the destroyed property rather than the replacement cost; (2) in setting an inadequate post-judgment interest rate; (3) in not awarding treble damages under the Unfair Practices Act, NMSA 1978, §§ 57–12–1 to –22 (1967, as amended through 1995); and (4) in not awarding punitive damages. We affirm, except in two respects. We remand to determine whether Mills–Strebeck had an insurable interest in the dealership property and,

if so, the extent of that interest. Also, we agree with Plaintiffs that a higher post-judgment interest rate should be provided for bad-faith damages.

## I. BACKGROUND

{2} On May 4, 1993, Tucumcari Chevrolet–Geo, Inc., filed for protection under Chapter 11 of the United States Bankruptcy Code. In late June 1993 the president of the corporation negotiated two agreements with Sidney Strebeck, who had interests in several New Mexico automobile dealerships. Under a purchase agreement (the Purchase Agreement) Strebeck agreed to acquire the dealership "free and clear of all liens and encumbrances" for $50,000. Under a management agreement (the Management Agreement) Strebeck agreed to operate the dealership prior to closing of the Purchase Agreement. Strebeck and Steve Mills began operating the dealership at the beginning of July. They organized Mills–Strebeck to own the dealership, with Strebeck owning 75% of the stock and Mills owning 25%. Strebeck assigned to Mills–Strebeck his rights under the Purchase Agreement and the Management Agreement.

{3} On July 15, 1993, a fire destroyed almost all the structures and inventory of the dealership, except new car inventory. At that time neither Mills–Strebeck nor Strebeck personally had paid anything to Tucumcari Chevrolet–Geo. Also, no pleadings had been filed in bankruptcy court to obtain authorization of the sale of assets outside the ordinary course of business, as required by the Bankruptcy Code, 11 U.S.C. § 363 (1994). A motion to authorize the sale was not filed until July 30, 1993, two weeks after the fire. An unsecured creditor and the United States Trustee filed objections to the motion. The bankruptcy court never held a hearing on the motion nor acted upon it. Instead, the court ordered that the case be converted to a Chapter 7 proceeding, and it appointed an estate trustee. On April 25, 1994, the estate trustee filed a Report of No Distribution and Notice of Abandonment of Assets, which included the statement: "I have neither received any property nor paid any money on

account of this estate except exempt property[.]"

{4} Strebeck had begun his business relationship with Chrysler in 1990, when he acquired coverage through Rodell Rudel, a field underwriting and sales manager for Chrysler. Although there was no corporate link between the various Strebeck automobile dealerships, the policy listed Teague–Strebeck (a dealership owned by Strebeck and Cleve Teague) as the named insured, with the remaining dealerships listed as additional insureds under a master policy. Chrysler charged one premium for the policy, which was paid by Teague–Strebeck; Teague–Strebeck then submitted claims on behalf of itself and the other dealerships. Sometime prior to March 23, 1993, Rudel told Cleve Teague that if Strebeck acquired a new dealership, there would be full coverage for a period of up to 90 days; Teague conveyed that representation to Strebeck.

{5} After the July 1993 fire Chrysler contested, the property-loss claims on the ground that Strebeck and his corporations had no insurable interest in the property. There were also disputes regarding coverage under the Garagekeepers Legal Liability (GKLL) provision of Teague–Strebeck's policy. GKLL coverage, roughly speaking, provides liability insurance with respect to customer vehicles that are damaged while being serviced at the dealership. Chrysler eventually covered claims for damages to customer vehicles, but the district court determined that Chrysler improperly delayed those payments and awarded $75,000 for injuries to the business reputation of Mills–Strebeck as a result of Chrysler's bad faith adjustment of the claims.

## II. ADDING MILLS–STREBECK AS A PLAINTIFF

{6} The original complaint was filed on November 3, 1994. It named Teague–Strebeck and Strebeck individually as the plaintiffs. Mills–Strebeck did not become a party until January 8, 1997, the day before trial. The motion to amend the complaint to add Mills–Strebeck as a plaintiff had been filed two days earlier. Strebeck was dismissed as a plaintiff by the district court at the conclu-

sion of trial testimony. Ultimately, the court entered judgment in favor of Mills–Strebeck.

{7} Chrysler contends that the district court erred in permitting the amendment adding Mills–Strebeck as a plaintiff and in concluding that the amendment related back to the filing of the original complaint. If the amendment did not relate back, according to Chrysler, Mills–Strebeck's claim is barred by the provision in the insurance policy that states: "No one may bring a legal action against us under this Coverage Part unless ... [t]he action is brought within two years after the date on which the direct physical loss or damage occurred." The loss occurred more than two years before Mills–Strebeck was added as a plaintiff.

{8} We believe that the issue before us is governed by our recent decision in *Crumpacker v. DeNaples*, 1998–NMCA–169, 126 N.M. 288, 968 P.2d 799. Crumpacker's suit against the defendants arose out of surgery performed in 1992. In 1994 she filed for bankruptcy. The bankruptcy case closed in August 1996. In the meantime, in February 1996 Crumpacker had filed her suit against the defendants. She had never disclosed in the bankruptcy proceeding her cause of action against the defendants or the fact that she had initiated litigation. In May 1997 Crumpacker filed a motion to add the bankruptcy trustee as the real party in interest. The trial court denied the motion and granted the defendants summary judgment.

{9} We reversed, ordering the trial court to allow the amended complaint. We relied on Rule 1–017(A) NMRA 1998, the final sentence of which states:

Where it appears that an action, by reason of honest mistake, is not prosecuted in the name of the real party in interest, the court may allow a reasonable time for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

We held that Crumpacker had made an "honest mistake" within the meaning of Rule 1–017(A). *Crumpacker*, ¶ 28. We rejected the

defendants' argument that Rule 1–015(C) NMRA 1998 prohibits relation back when the new plaintiff is added after expiration of the period of limitations. *See id.* ¶¶ 22–37. Rule 1–015(C) reads:

> **Relation back of amendments.** Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment:
>
> (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and
>
> (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

We found inapplicable the portion of the Rule relating to new parties because it does not apply to a new plaintiff but only to a " 'party *against whom a claim is asserted.*' " *Crumpacker,* ¶ 25 (quoting Rule 1–015(C)).

■ {10} Here, as in *Crumpacker,* we hold that the relation-back provision of Rule 1–017(A) applies because the failure to include Mills–Strebeck as an original plaintiff was an honest mistake. In the case before us the district court entered several findings of fact and conclusions of law pertinent to this issue. Finding 26 states in part:

> [F]or the period [Chrysler] provided insurance services to [Teague–Strebeck], [Teague–Strebeck] acted as an insurance clearinghouse for the Strebeck auto entities. [Chrysler] charged one premium for the insurance policy, which was paid by [Teague–Strebeck], and [Teague–Strebeck] submitted claims for itself and on behalf of the other Strebeck auto entities.

Findings 134 through 136 state specifically that in December 1993 Chrysler amended the Teague–Strebeck policy to name Mills–Strebeck as an additional insured, with an effective date of July 7, 1993 (a week before the fire), and that Teague–Strebeck paid the premium for the amendment in 1994. The district court concluded that Teague–Strebeck was a "proper party plaintiff to bring this action for the benefit of [Mills–Strebeck]." Moreover, it is undisputed that Chrysler made a payment of $96,200 to Teague–Strebeck in May 1994 to cover losses from the fire at the Mills–Strebeck dealership.

{11} We recognize that the district court did not make an explicit finding that the failure to join Mills–Strebeck as a plaintiff was an "honest mistake." *See* Rule 1–017(A). But no rule requires a district court to enter findings of fact or conclusions of law in support of an order permitting amendment of a pleading. In our view, the record is clear that the district court in essence found that the failure to name Mills–Strebeck as a plaintiff was an honest mistake arising from the course of dealings among the parties and that the addition of Mills–Strebeck as a plaintiff caused absolutely no prejudice to Chrysler's ability to defend against the claims. Given this honest mistake, Rule 1–017 permitted joinder of Mills–Strebeck as a plaintiff, with the joinder treated as if it had occurred when the original complaint was filed. We find no abuse of discretion by the district court in granting the amendment adding Mills–Strebeck as a plaintiff. *See Crumpacker,* ¶ 16 (ruling on motion to amend is reviewed for abuse of discretion).

{12} Because recognition of Mills–Strebeck as a proper plaintiff moots any claim by Teague–Strebeck, we confine our discussion in the remainder of the opinion to the claims of Mills–Strebeck.

## III. BAD FAITH DAMAGES

■ {13} The district court concluded that Mills–Strebeck was entitled to $75,000 in damages from Chrysler "for injuries it received to its business reputation as a result of [Chrysler's] bad faith adjustment of its claim." Chrysler's brief in chief points out that the conclusion does not state explicitly whether it relates to the handling of claims for damages to dealership property or claims

for damage to customer vehicles. As we understand the court's findings, however, the damages arose from customer ill will created by delay in handling their claims. Several findings address delays by Chrysler in acknowledging full coverage of customer vehicles under the GKLL provision of the policy. We note two findings in particular. Finding 152 states:

At no time between the fire and the time that the litigation herein commenced did [Chrysler] bring to the attention of [Mills–Strebeck] that the GKLL written on all of the other Strebeck auto entities was written on a primary basis, which would obviate the need for assessing fault and would allow for the direct payment to customers for their damages suffered while in the Strebeck auto entity shop.

Finding 154 states:

The inability of [Mills–Strebeck] to address the damages incurred by its customers as a result of the fire created ill will among the customers whose vehicles were damaged by the fire and damaged the reputation of [Mills–Strebeck].

In our view, these and other findings by the district court, none of which are challenged by Chrysler, suffice to support a conclusion that Chrysler acted in bad faith in handling the GKLL claims.

{14} Chrysler contends that regardless of such findings, it cannot be held liable for bad faith because its obligation to pay in this case was predicated on Rudel's misrepresentations, not on any contractual duty. It relies on language in *Charter Services, Inc. v. Principal Mutual Life Insurance Co.*, 117 N.M. 82, 868 P.2d 1307 (Ct.App.1994). We wrote:

[T]he concept of bad faith failure to pay in the insurance context does not arise unless there is a contractual duty to pay under the policy.

. . . .

Plaintiff's claim of bad faith apparently was based on Defendant's refusal to pay everything demanded as a result of [the agent's] misrepresentations. However, absent any contractual obligation to pay under the policy, we do not believe the concept of bad faith comes into play.

*Id.* at 88, 868 P.2d at 1313. Chrysler asserts that because the district court here did not conclude that there was a contractual duty to pay under the Chrysler policy, it was improper to award any damages for bad faith. It argues that bad faith damages cannot arise from "imputed coverage based on negligent misrepresentation."

{15} We do not read *Charter Services* so broadly. In that case the agent had represented to the plaintiff that a comprehensive group medical insurance policy "would cover on-the-job injuries suffered by [Charter Services'] employees, and that, if [Charter Services] bought the policy, it was not necessary to buy a separate workers' compensation insurance policy." *Id.* at 84, 868 P.2d at 1309. When an employee was later injured on the job, Charter Services found itself liable under the Workers' Compensation Act for the employee's injuries. Charter Services did not contend that the insurance company had failed to pay under a workers' compensation policy. Indeed, it does not appear that the insurer even offered workers' compensation policies. The award to Charter Services was simply for damages arising from the misrepresentation that it did not need workers' compensation insurance coverage. *See id.* at 85, 868 P.2d at 1310.

{16} In the case before us, in contrast, the claim of Mills–Strebeck is that it should have been treated as an additional insured under the insurance policy, even though the policy in existence at the time of the fire did not name Mills–Strebeck as a principal or additional insured. The damages awarded by the district court to Mills–Strebeck were calculated as if it was covered under the policy. The court's Conclusion of Law 13 states:

The representations of [Rudel] regarding coverage, and the absence of conditions on the same, *had the legal effect of amending the policy terms.* [Mills–Strebeck] should have the benefit of the maximum coverages for any business locations specified in the Summary of Protection ... on the insurance policy.

(Emphasis added.) In other words, the district court treated Mills–Strebeck as if it were covered under the insurance policy.

Because Chrysler has not challenged on appeal the factual or legal basis of Conclusion 13, we need not explore the various legal theories under which the damages might have been awarded. *See, e.g., Fryar v. Employers Ins. of Wausau*, 94 N.M. 77, 81, 607 P.2d 615, 619 (1980) (apparently applying promissory estoppel to modify insurance contract based on agent's misrepresentations concerning policy provisions); Restatement (Second) of Torts § 549(2) (1977) (victim of intentional misrepresentation in a business transaction may be entitled to benefit-of-the-bargain damages); *First Interstate Bank of Gallup v. Foutz*, 107 N.M. 749, 751–52, 764 P.2d 1307, 1309–10 (1988) (damages for negligent misrepresentation are limited to out-of-pocket losses rather than benefit of the bargain). Conclusion 13 distinguishes this case from *Charter Services*, in which there was no ruling that the insurance company was obligated by the terms of a policy. Given that conclusion, Chrysler owed Mills–Strebeck all duties owed to a business covered by the policy. Those duties included the duty of good faith in handling claims. *See Dairyland Ins. Co. v. Herman*, 1998–NMSC–005, ¶ 12, 124 N.M. 624, 954 P.2d 56. Thus, the award of bad faith damages must be sustained. The law set forth in *Charter Services* does not preclude the award in this case.

## IV. INSURABLE INTEREST

{17} To recover on an insurance policy for property damage, the insured must have an insurable interest in the property at the time of the damage. *See* NMSA 1978, § 59A–18–6 (1984). Chrysler's principal contentions on appeal relate to Mills–Strebeck's insurable interest in the dealership property for the purpose of collecting on the fire insurance. (Chrysler does not dispute that Mills–Strebeck had a sufficient connection to the property to obtain coverage for liability insurance. *See* Robert E. Keeton and Alan I. Widiss, *Insurance Law* (Student Edition) § 3.4, at 166 (2d ed. 1988) (Keeton & Widiss) ("For purposes of liability insurance, the existence of an insurable interest should be determined on the basis of whether the insured may be liable. . . .")). First, Chrysler asserts that Mills–Strebeck had no insurable interest in the dealership property at the

time of the fire because the Purchase Agreement and the Management Agreement had not received the necessary approval from the bankruptcy court. As a back-up argument, Chrysler contends that even if Mills–Strebeck had an insurable interest, its recovery must be reduced by the $50,000 purchase price under the Purchase Agreement and by the amount of a secured creditor's lien on the dealership assets.

{18} We agree in part with Chrysler's position. We agree that Mills–Strebeck did not hold title to the property at the time of the fire. Nevertheless, Mills–Strebeck may have had an insurable interest. We must remand to the district court for further findings on this issue. We also agree that even if there was an insurable interest, the insurable interest did not extend to the full value of the property. We first discuss whether an insurable interest existed; we then discuss the extent of the possible insurable interest.

### A. Existence of Insurable Interest

{19} Even if one pays the premium for an insurance policy with respect to certain property, one must have an insurable interest in the property in order to collect under the policy. Section 59A–18–6 states:

A. No contract of insurance of property or of any interest in property or arising from property shall be enforceable as to the insurance except for the benefit of persons having an insurable interest in the things insured as at the time of the loss.

B. "Insurable interest" as used in this section means any actual, lawful and substantial economic interest in the safety and preservation of the subject of the insurance free from loss, destruction, pecuniary damage or impairment.

{20} Chrysler contends that Mills–Strebeck had no insurable interest in the dealership property because the bankruptcy court had not approved the Purchase and Management Agreements. According to Chrysler, the sale of Tucumcari Chevrolet–Geo constituted a sale of property of the bankruptcy estate outside the ordinary course of business and therefore 11 U.S.C. § 363(b) (1994) required bankruptcy court approval of the

sale. Likewise, it argues, the Management Agreement had to be approved by the bankruptcy court either because it constituted an agreement to employ a professional, *see* 11 U.S.C. § 327 (1994), or because it constituted an effective disposition of the property, *see* 11 U.S.C. § 363(b).

{21} Nevertheless, the district court held that Mills–Strebeck had an insurable interest in the assets of the dealership. In support of this ruling, Mills–Strebeck contends that the Purchase Agreement and the Management Agreement were fully enforceable, valid contracts. It asserts that any problem caused by the failure to obtain bankruptcy approval of the contracts "was cured by the subsequent abandonment and closure of the Chapter 7 bankruptcy case." It relies on the district court's Conclusion of Law 31, which states:

> The abandonment by the Trustee in the [Tucumcari Chevrolet–Geo] bankruptcy and the subsequent dismissal of the case caused a reversion ab initio of title to [Tucumcari Chevrolet–Geo] as though the bankruptcy filing had never occurred. Property abandoned under [11 U.S.C.] Section 554 ceases to be property of the estate and the party which holds a possessory right to the property at the time of the filing of the bankruptcy petition reacquires that right upon abandonment.

The district court apparently believed that the contracts could be treated as if there had never been a bankruptcy proceeding.

{22} Chrysler responds that the trustee's abandonment of assets and dismissal of the case both occurred after the property in question was destroyed, so there was no property to revert, and certainly no authorized abandonment. It cites *Scharmer v. Carrollton Manufacturing Co.*, 525 F.2d 95, 98 (6th Cir.1975), for the proposition that a trustee can abandon assets only if the assets exist and the trustee knows that they exist.

{23} We need not address this argument, however, because we agree with Chrysler that this Court's recent decision in *Edwards v. Franchini*, 1998–NMCA–128, 125 N.M. 734, 965 P.2d 318, forecloses the contention that title reverted *ab initio*. The plaintiffs in *Edwards* filed their suit in 1994. *See id.* ¶ 2.

They had filed a Chapter 11 bankruptcy petition in 1989, and in 1993 the bankruptcy court had entered a final decree stating that the bankruptcy estate had been fully administered. *See id.* ¶ 1. Although the plaintiffs' claims against the defendants were property of the bankruptcy estate, the claims had never been scheduled in the bankruptcy proceeding nor brought to the attention of the bankruptcy trustee. *See id.* ¶ 6. We held that the trustee was the real party in interest with capacity to sue on the claims and that the plaintiffs had no right to enforce the claims in their own names. *See id.* We therefore affirmed the district court's summary judgment in favor of the defendants. After the summary judgment, however, the plaintiffs had sought and obtained a reopening of their bankruptcy proceeding and the reappointment of the trustee so that the trustee could abandon the claims against the defendants, thereby permitting the plaintiffs to pursue their claims. *See id.* ¶ 12. On that basis the plaintiffs requested this Court to remand to the district court "for a new ruling absent the existence of any bankruptcy." *Id.* ¶ 13. We denied the request, disagreeing with the plaintiffs' contention that the bankruptcy court's order "restored to them all rights to pursue their claims against [the defendants] as if the bankruptcy proceedings had not occurred." *Id.* ¶ 15. We wrote, "Although we agree with Plaintiffs that the bankruptcy court's order returns the rights of action to Plaintiffs, we believe that it does so effective as of the date of the order, not retroactively." *Id.* Noting that the Bankruptcy Code provides that property "revests," 11 U.S.C. § 349(b)(3) (1994), we stated that "[t]he import of the words which Congress chose is that there exists a period of time in which the property was not vested in the entity in which it 'revests.'" *Id.* ¶ 16.

{24} Following *Edwards*, we hold that the abandonment of assets and dismissal of the bankruptcy could not validate the Purchase Agreement and the Management Agreement *ab initio*. Any abandonment of assets by the Trustee merely provided Tucumcari Chevrolet–Geo with title to the property, which it could then (after the abandonment) transfer to Mills–Strebeck or another

entity. Thus, we must treat the two agreements as having been contingent at the time of the fire on approval by the bankruptcy court. We note that Plaintiffs have not disputed that the Bankruptcy Code requires such approval.

{25} The question remaining, then, is whether Mills–Strebeck could have had an insurable interest in the dealership property at the time of the fire even though its agreements with Tucumcari Chevrolet–Geo were dependent on bankruptcy court approval. On the one hand, Mills–Strebeck emphasizes that title to property is not an absolute requirement for an insurable interest. It relies on *Suggs v. State Farm Fire & Casualty Co.,* 833 F.2d 883 (10th Cir.1987). Applying New Mexico law, the court in that case held that the Suggs had an insurable interest in a mobile home in which they had lived for six weeks prior to the loss. *See id.* at 887–88. They were co-obligors on a note secured by the home, but their only claim to an ownership interest was an agreement that was "oral and arguably unenforceable." *Id.* at 887.

{26} On the other hand, Chrysler cites several cases from other jurisdictions which held that the insured lacked an insurable interest because the claimed interest in the property was based on an invalid or contingent agreement. In *Mackie & Williams Food Stores, Inc. v. Anchor Casualty Co.,* 216 F.2d 317 (8th Cir.1954), the court held that the purchaser of an automobile lacked an insurable interest in the vehicle because the seller had failed to comply with statutory requirements for transfer of title. In *Klukavy v. United National Insurance Co.,* 654 F.Supp. 622 (E.D.Mich.1987), the purchasers of a bar claimed entitlement to the proceeds of fire insurance. They had both a purchase agreement and a management agreement with respect to the bar, but neither agreement had received the necessary approval of the state liquor control commission at the time of the fire. Both the seller and the purchasers were named beneficiaries under the policy " 'as their interest may appear.' " *Id.* at 624. The court awarded the proceeds to the seller. In *Price v. Trinity Universal Insurance Co.,* 8 Kan.App.2d 223, 654 P.2d

485 (1982), the occupants of a house were held to have no insurable interest in the house when their occupancy was without the consent of the owner and was pursuant to a contract that was void for mutual mistake. *Phalen Park State Bank v. Reeves,* 312 Minn. 194, 251 N.W.2d 135, 138 (1977), held that "an insurable interest may not be predicated on a contract which is void or unenforceable." The court remanded the case for trial to determine whether the bank's mortgage was usurious and therefore void. If so, the court stated, "[t]he bank thus loses nothing by reason of the destruction of the property for it had nothing to which it had an enforceable right." *Id.* at 139. In *Hane v. Hallock Farmers Mutual Insurance Co.,* 258 N.W.2d 779 (Minn.1977), the court held that the insured no longer had an insurable interest in the farm on which he lived once he had assigned his interest in the contract to purchase the farm, even though he had an informal agreement with the assignee that he would have an opportunity to repurchase the farm. Finally, in *Gossett v. Farmers Insurance Co.,* 133 Wash.2d 954, 948 P.2d 1264, 1272 (1997) (en banc), the court held that "mere possession and expectation of ownership do not establish an insurable interest." Thus, the prospective purchasers of a house, who had been in possession of the house and had even made some improvements, had no insurable interest (except as to their improvements) when they had no agreement to purchase the house and the house was not security for any obligation owed by them. *See id.* at 1272–73.

{27} To resolve this dispute, we examine the purposes of the insurable-interest doctrine. New Mexico's insurable-interest statute is not a modern invention, unique to New Mexico. It traces its origins to English statutes of the eighteenth century. *See* Keeton & Widiss, *supra,* §§ 3.2(a), (b). "[T]he purposes of the insurable interest requirement remain those that prompted the doctrine's creation: (1) discouraging the practice of using insurance as a device for gambling or wagering; and (2) removing the incentive for the procurer of the insurance to destroy the subject matter of the insurance, whether it be a life or an item of property." Robert H. Jerry, II, *Understanding Insurance Law*

§ 40, at 236 (2d ed. 1996) (Jerry). The doctrine is intimately related to the principle of indemnity, which is "[t]he concept that insurance contracts shall confer a benefit no greater in value than the loss suffered by an insured." Keeton & Widiss, *supra*, § 3.1(a), at 135. The insurable-interest doctrine and the principle of indemnity share the objectives of "avoiding inducements to wagering, avoiding inducements to destruction of insured property, and avoiding net gain to an insured through receipt of insurance proceeds that exceed the loss suffered by the claimant." Keeton & Widiss, *supra*, § 3.4(b)(1), at 173.

{28} The concern about gambling arises from the recognition that almost any gamble could be recast as an insurance contract. To illustrate by an extreme example, in eighteenth-century England insurance policies apparently were sold on the lives of those on trial for capital crimes; the policies amounted to bets that the accused would be convicted and executed. *See* Jerry, *supra*, § 40, at 234. The insurable-interest doctrine provides a means to prevent such evasion of gambling laws.

{29} The second rationale—avoiding inducements to destruction of insured property—recognizes the problem of "moral hazard." If one's financial well-being would be enhanced by the loss of property rather than its preservation, there would be a temptation to destroy the property or, at least, to fail to take reasonable precautions to protect the property. This moral hazard arises whenever one can obtain insurance coverage on property for more than the property is worth to the insured. Given current societal attitudes toward gambling, the moral-hazard concern appears to be the stronger peg on which to hang the insurable-interest doctrine today.

█ {30} From the objectives of the insurable-interest doctrine, two conclusions follow. First, the concern about moral hazard tells us that whether the insured had an insurable interest in property should be determined as of the date of the loss to the property. At the time of the loss, did the insured have an incentive to destroy the property or be lax in its care? The insured's

incentive at some other time is irrelevant to the loss that actually occurred. Accordingly, New Mexico's insurable-interest statute speaks of "an insurable interest in the things insured as at the time of the loss." Section 59A–18–6(A); *see Fulwiler v. Traders & Gen. Ins. Co.*, 59 N.M. 366, 374, 285 P.2d 140, 146 (1955) (interest "must be determined by the facts at the time of loss"). This is also the rule favored by commentators and most other jurisdictions. *See* Jerry, *supra*, § 44[a]; Keeton & Widiss, *supra*, §§ 3.3(b)(2), (3).

{31} It should be noted that this rule renders immaterial any post-fire validation of the Purchase Agreement or Management Agreement in this case. Even if the bankruptcy court could retroactively validate the contracts between Mills–Strebeck and Tucumcari Chevrolet–Geo *ab initio*, the moral hazard must be evaluated in light of what was known at the time of the loss, when there had been no such validation.

█ {32 } The second conclusion that follows from the objectives of the insurable-interest doctrine is that the test for deciding whether the insured has an insurable interest should be the insured's factual expectations, not the technicalities of legal interests. Speaking roughly, if the insured faces a real risk of loss, Section 59A–18–6 should not bar coverage of the loss. Insurance coverage in such a circumstance is not a true wager, and moral hazard arises only if coverage is excessive (an issue that we defer discussing until the next section of the opinion). Thus, New Mexico has adopted the following formulation by the United States Supreme Court:

> It is well settled that any person has an insurable interest in property, by the existence of which he will gain an advantage, or by the destruction of which he will suffer a loss, whether he has or has not any title in, or lien upon, or possession of the property itself.

*Fulwiler*, 59 N.M. at 373, 285 P.2d at 144 (quoting *Harrison v. Fortlage*, 161 U.S. 57, 65, 16 S.Ct. 488, 40 L.Ed. 616 (1896)); *accord Universal CIT Corp. v. Foundation Reserve Ins. Co.*, 79 N.M. 785, 786, 450 P.2d 194, 195 (1969); *Suggs*, 833 F.2d at 887. As we un-

derstand this test, New Mexico has joined the majority of jurisdictions and the leading commentators in adopting the factual-expectations approach. *See* Jerry, *supra,* § 42, at 249; Keeton & Widiss, *supra,* § 3.4(a)(5), at 168–72; Bertram Harnett and John V. Thornton, *Insurable Interest in Property; A Socio–Economic Reevaluation of a Legal Concept,* 48 Colum. L.Rev. 1162, 1185 (1948) (Harnett & Thornton). A strictly legal right—either a property or a contract right—is not necessary so long as the risk of loss to the insured is clear. We believe that the test adopted by our Supreme Court in *Fulwiler* is essentially the same as two other formulations that may convey the concept more clearly. One commentator has suggested that an "insurable interest exists if the insured, independently of the policy of insurance, will gain economic advantage from the continued existence of the insured property, or will suffer economic disadvantage on damage to the property." Harnett & Thornton, *supra,* at 1185. A New Jersey court has written, "The test of insurable interest in property is whether [the] insured has such a right, title or interest therein, or relation thereto, that he will be benefitted by its preservation and continued existence or suffer a direct pecuniary loss from its destruction or injury by the peril insured against." *Hyman v. Sun Ins. Co.,* 70 N.J.Super. 96, 175 A.2d 247, 249 (1961) (quoting *Farmers Mut. Fire Ins. Co. v. Pollock,* 52 Ga.App. 603, 184 S.E. 383, 386 (1936)) (internal quotation marks and emphasis omitted).

■ {33} We now turn to the application of these propositions to the case before us. First, however, we emphasize that application of the insurable-interest doctrine does not require any determination of evil motives or misconduct of any kind by the insured. Perhaps the law could deal with moral hazard simply by denying coverage in excess of the insurable interest only upon proof that the insured was in some way culpable in the destruction or damage to the property. But that is not the law. The refusal to consider actual culpability can be justified on the grounds that investigation and proof of culpability would not be a productive use of resources and, perhaps more importantly, there is no unfairness in not paying more

than the insured has lost. (Excess premiums paid for the policy could be refunded. *See generally* Keeton & Widiss, *supra,* § 3 .3(d).) Also, the policy against gambling is a concern even in the absence of moral hazard. Thus, we emphasize that application of the insurable-interest doctrine to refuse or reduce a claim should in no way be taken as a reflection on the character of the insured. In particular, there is not even a hint in the record before us of any misconduct by the insured.

■ {34} At first glance there may appear to be a gross violation of the insurable-interest doctrine in this case. Mills–Strebeck was to pay only $50,000 for the property that was destroyed by the fire. But the recovery under the insurance policy for the actual cash value of the property was more than $300,000. (For convenience, we will use $300,000 as the amount of the recovery.) Mills–Strebeck would certainly experience a substantial gain by collecting $300,000 in insurance money on a $50,000 investment.

{35} That impression, however, does not withstand analysis. The financial benefit to Mills–Strebeck—obtaining $300,000 on a $50,000 "investment"—would not be the result of the fire and the subsequent insurance recovery. Rather, it would be the result of Mills–Strebeck's advantageous contract with Tucumcari Chevrolet–Geo. If the contract had been consummated, with the dealership property coming to Mills–Strebeck, then Mills–Strebeck would have owned the property worth $300,000 in return for the $50,000 purchase price. In other words, Mills–Strebeck would have achieved the same $250,000 gain in the absence of the fire and without any insurance coverage.

{36} Thus, Mills–Strebeck apparently had a substantial financial interest in the dealership property that was destroyed by the fire. In the absence of insurance coverage, the fire would have prevented Mills–Strebeck from gaining the advantage of the deal made with Tucumcari Chevrolet–Geo. Assuming an enforceable contract for acquisition of the dealership property, there is no moral hazard here. Mills–Strebeck would have no incentive to destroy the dealership

property or to be lax in caring for it. Nor would acquiring the insurance coverage be akin to placing a bet.

{37} But what about the fact that the Purchase Agreement was not effective without approval by the bankruptcy court? In our view this fact is not decisive, but presents a question of degree. From the point of view of moral hazard, it makes a big difference whether approval of the contract was a virtual certainty or a long shot. If the bankruptcy court was unlikely to approve the deal—perhaps because it was far too favorable to the purchaser—then a moral hazard would arise. The prospective purchaser would be better off with the certainty of insurance proceeds than the slim possibility of a favorable consummated contract. On the other hand, if the deal was almost certain to go through, the moral hazard would be slim to none. Whenever approval is less than a virtual certainty, however, there is at least some moral hazard, and the uncertainty could be said to add a gambling component to the insurance contract.

{38} This analysis can explain the results in several of the cases relied upon by Chrysler. In *Price, Hane,* and *Gossett* the claimant may ultimately have acquired an ownership interest in the damaged property, but the "expectation of ownership," *Gossett,* 948 P.2d at 1272, was too contingent, too uncertain, to support an insurable interest. (The other cases cited by Chrysler are distinguishable on other grounds. In *Klukavy* the question was not so much whether the prospective purchaser had an insurable interest, but whether its interest was superior to the seller's interest. In *Mackie & Williams* and *Phalen Park* the issue was whether the insured's alleged property interest was acquired in violation of state law.)

{39} With this analysis in mind, we adopt the following standard. Even though the Purchase Agreement was subject to approval by the bankruptcy court, Mills–Strebeck had an insurable interest in the dealership property if the agreement would in fact have been approved by the bankruptcy court had there been no fire. Although perhaps it would be more accurate to measure the moral hazard in terms of the purchaser's subjec-

tive expectations regarding whether the deal would go through, an objective test is more workable and more in keeping with the general approach of determining insurable interest without reference to the state of mind of the particular insured.

{40} Mills–Strebeck may well be able to satisfy the test here. The creditors with a security interest in the dealership property had approved the Purchase Agreement, and Mills–Strebeck apparently contends that the unsecured creditors would have suffered no loss from the agreement because the value of the property was approximately the amount secured by the liens of the secured creditors, leaving nothing for unsecured creditors. We also observe that even though the agreement required court approval, Mills–Strebeck apparently did not have the option of withdrawing its offer. On the other hand, one unsecured creditor and the United States Trustee had each filed objections to the sale. In any event, we need not resolve the matter ourselves. We remand to the district court for a finding regarding whether the sale would have been approved by the bankruptcy court.

{41} We recognize that our holding probably extends the notion of an insurable interest as far as it has been extended in any jurisdiction. Nevertheless, we believe that our holding comports with the language and purposes of our insurable-interest statute. Moreover, our holding should cause no undue problem for insurance companies. Nothing requires insurance companies to write policies for contingent interests such as the one here. We note that Chrysler has not argued on appeal that the claimed loss was not covered by the policy.

{42} Although several of the remaining issues on appeal would be mooted if on remand the district court finds no insurable interest, we believe the more efficient course is to address them and avoid a future appeal on the same issues should the district court determine that an insurable interest exists.

## B. Extent of Insurable Interest

{43} The conclusion that the insured has an insurable interest in the destroyed property does not end the inquiry.

It is also necessary to measure that insurable interest, to determine its extent. Both the insurable-interest doctrine and the indemnity principle can require limitations on recovery by those with insurable interests. *See* Jerry, *supra*, § 93[a], at 571 (that an insured cannot recover more than the insured's interest in the property is "a particular application of the insurable interest doctrine"); Harnett & Thornton, *supra*, at 1175–76 (noting relationship between existence of insurable interest and the extent of the interest); Keeton & Widiss, *supra*, §§ 3.1(a) (the principle of indemnity), 3.6(a) (rules for preventing net gain). The insurable interest ordinarily should not exceed the potential loss to the insured.

{44} A particular problem may arise when more than one person has an insurable interest in the same property. Allowing recovery for the full value of the destroyed property by everyone with an insurable interest in the property poses a moral hazard. The insureds as a group should not be better off with the property destroyed. Assume that three different persons each have insurable interests in property that is worth $100,000. The incentive for mischief (or neglect) would be great if each could collect $100,000 (a total of $300,000) upon the loss of the $100,000 worth of property. *Cf.* Keeton & Widiss, *supra*, § 4.3(e) (noting that when purchaser and seller of property both carry property insurance, paying both can be inconsistent with the principle of indemnity and the objectives of the insurable interest doctrine if the sum of the payments exceeds the property's value). *See generally id.* § 4.6.

{45} Our analysis of the extent of Mills–Strebeck's insurable interest in the dealership property requires consideration of both the potential loss to Mills–Strebeck and the potential recovery of all those with insurable interests in the dealership property. Before we address the unique facts of this case, however, it may be instructive to review some court-fashioned rules that prevent overcompensation in similar circumstances.

{46} One rule recognized in New Mexico is that an insured with a limited interest in property can recover only to the extent of that limited interest. In *City of Carlsbad v. Northwestern National Insurance Co.*, 81 N.M. 56, 463 P.2d 32 (1970), the City, which had an insurable interest in the destroyed property, was not entitled to recover its full value. The City owned a building at the airport which had been appraised at $4000 in February 1967. Later in the year the City requested bids for the purchase and removal of the building from the airport. On December 11, 1967, the City accepted a bid for $300. Eleven days later fire destroyed the building. The successful bidder cleared the property but never paid the $300. Although the district court valued the building at $3000, our Supreme Court wrote:

> The general rule ... is that the insured with only a limited interest cannot recover the full value of the property destroyed but is limited to the value of his actual interest therein. At the time of the fire the [City's] interest was in receiving the $300.00 in payment for the building and in having the building and all rubbish and debris cleared ....

*Id.* at 59, 463 P.2d at 35 (citations omitted). The court held that the City could recover only $300 on the policy. *See id.*

{47} A second rule stated by our Supreme Court is that as between a buyer and seller with interests in the same property, "the party who bears the risk of loss is entitled to any and all insurance proceeds, less an offset for the amount required to reimburse the payor of the premiums, regardless of who contracts for the coverage." *Berlier v. George*, 94 N.M. 134, 135–36, 607 P.2d 1152, 1153–54 (1980). In that case the Berliers reached an agreement to buy George's ranch for $445,000, payable in installments. The house on the ranch was destroyed by fire, at a time when the risk of loss had already shifted to the Berliers. In accordance with the purchase contract, the Berliers had obtained $10,000 in fire insurance on the house; George had paid additional premiums to raise the coverage to $30,000. *See id.* at 135, 607 P.2d at 1153. The parties agreed that the first $10,000 of the $30,000 coverage should be paid to the holder of the first mortgage on the house. George con-

tended that the remaining $20,000 should go to him. The Berliers successfully argued that the $20,000 should be credited to the purchase price. *See id.* Otherwise, George would have received a windfall, since the Berliers still owed the balance due on the purchase price. If George had retained the insurance proceeds for himself, without crediting them to the purchase price, he would have benefitted financially from the fire. The prospect of such a result would pose a moral hazard.

{48} Even after application of the *Berlier* rule, moral hazard can arise if the total insurance coverage acquired by the buyer and seller exceeds the value of the destroyed property. A third rule limits the total recovery of all insureds to the value of the property. This rule is illustrated by the circumstances in *Whitten v. Cincinnati Insurance Co.,* 189 Ill.App.3d 90, 136 Ill.Dec. 394, 544 N.E.2d 1169 (1989). The Whittens had a contract with a bank to purchase a home for $67,500, but the house burned down before closing on the sale. *See id.* 136 Ill. Dec. 394, 544 N.E.2d at 1170. The Whittens had obtained a $70,000 fire insurance policy on the house, while the bank had a $56,000 policy. *See id.* 136 Ill.Dec. 394, 544 N.E.2d at 1171. The bank recovered $51,000 (the policy limit less a $5,000 deductible). Although the parties terminated the original sales contract, *see id.,* the bank later sold the property to the Whittens for $16,500, *see id.* 136 Ill.Dec. 394, 544 N.E.2d at 1173. (In effect, the bank's insurance recovery was credited to the purchase price, as in *Berlier.*) The appeals court held that the $51,000 received by the bank should be subtracted from the $70,000 policy limit to calculate the Whittens' recovery from their insurer. *See id.* 136 Ill.Dec. 394, 544 N.E.2d at 1175. The Whittens could therefore collect only $19,000. *See id.* 136 Ill.Dec. 394, 544 N.E.2d at 1176. The court wrote:

> Public policy considerations preclude an award to plaintiff of the amount of the policy. We cannot encourage future fraud on insurance companies. Such a decision might well provide an incentive for an unscrupulous home buyer to insure the property to be purchased, burn it, pay a re-

duced price for it, and then recover fully under the insurance policy. Further, allowing the full policy amount in this case would unjustly enrich the plaintiffs, another result public policy will not allow.

*Id.* (We should add that we are not certain that we agree fully with *Whitten.* It is not clear to us why the bank's insurance recovery of $51,000 was subtracted from the $70,000 policy limit rather than from the value of the property—which may have been greater or less than $70,000. The concerns expressed in the quoted paragraph would not arise so long as the total recovery by the bank and the Whittens is less than or equal to the property's value.)

{49} We now turn to the special case before us on this appeal. There was no enforceable contract of sale at the time of the fire because the bankruptcy court had not approved the transaction. The parties have not provided, nor have we found, precedents that address specifically the potential problem of overcompensation in this context. Nevertheless, the objective of avoiding moral hazard provides sufficient guidance to determine the applicable law.

{50} First, we consider the effect of the $50,000 purchase price. If the contracts between Mills–Strebeck and Tucumcari Chevrolet–Geo had been enforceable, the purchase price would be irrelevant to the determination of the extent of Mills–Strebeck's insurable interest. Because the Management Agreement provided that Mills–Strebeck bore the risk of loss, Mills–Strebeck would owe the $50,000 to the bankruptcy estate and would be entitled to recover $300,000, the full value of the destroyed dealership property. *See Berlier,* 94 N.M. at 135–36, 607 P.2d at 1153–54. Here, however, at the time of the fire, Mills–Strebeck apparently had no legal obligation to pay the $50,000 to anyone. Therefore, recovery of the $300,000 would place Mills–Strebeck in a better financial position than if the purchase had been consummated. It would obtain the $300,000 value of the property without bearing any obligation to pay the $50,000 purchase price. The moral hazard is apparent. In the absence of any obligation by Mills–Strebeck to pay the $50,000, its recovery

under the property insurance—its insurable interest in the dealership property—must be reduced by $50,000.

{51} Second, Chrysler argues that we must also take into account a bank lien of $89,579.75 on the dealership property at the time of the fire. To protect its lien, the bank acquired insurance on the dealership property. After the fire the insurer paid the bank $81,748.12.

{52} The lien in itself does not affect Mills–Strebeck's insurable interest. The Purchase Agreement provided that Mills–Strebeck would acquire the dealership property "free and clear of all liens and encumbrances." The existence of liens on the property prior to consummation of the sale would therefore be irrelevant to Mills–Strebeck's financial interest in the property.

{53} But the insurance payment to the bank presents problems. To the extent that the insurance recovery by the bank exceeded the $50,000 purchase price, the insureds— Mills-Strebeck and the bank—taken together could be better off after the fire than before. If Mills–Strebeck were to recover $250,000, the total recovery by the two insureds would be $331,748.12, which is $31,748.12 more than the actual value of the insured property. Such overcompensation poses a moral hazard.

{54} It is worth noting how this moral hazard would have been avoided if the Purchase Agreement had been approved by the bankruptcy court. In that event, the bank could have collected at most $50,000 on its insurance, because its financial interest in the property would have been limited to what it would receive out of the $50,000 purchase price. *See City of Carlsbad,* 81 N.M. at 59, 463 P.2d at 35. Also, the insurance proceeds received by the bank would have been credited to the purchase price because Mills–Strebeck bore the risk of loss to the property. *See Berlier,* 94 N.M. at 135–36, 607 P.2d at 1153–54. Finally, that credit would have been subtracted from the value of the property to set the maximum recovery allowable on Mills–Strebeck's own policy. *See Whitten,* 136 Ill.Dec. 394, 544 N.E.2d at 1175. (For present purposes, we ignore the special considerations that would arise if Mills–Strebeck were entitled to replacement costs under its policy. *See* Keeton & Widiss, *supra,* § 3.9(g).)

{55} What is the appropriate means of avoiding the moral hazard here? There is no ground to reduce the payment to the bank. Until the bankruptcy court approved the Purchase Agreement (which would reduce the amount that the bank could recover on its lien to a portion of the $50,000 sale price), the bank's loss would equal the value of its lien on the destroyed property. *Cf. City of Carlsbad.* Hence, the bank should receive the entire $81,748.12. The absence of an enforceable contract of sale also precludes any requirement that the bank apply the insurance proceeds to the $50,000 purchase price for the benefit of Mills–Strebeck. *Cf. Berlier.* Perhaps the insurance payments to the bank and to Mills–Strebeck could both be reduced proportionately so that the total came to $300,000. But that would be unfair to the bank, which had a valid lien, as compared to Mills–Strebeck's mere expectancy. In our view, the equitable result is to permit the bank to retain the insurance proceeds of $81,748.12 and to adjust Mills–Strebeck's insurable interest accordingly. The fairness of this result may become more apparent if one considers what would have happened if Tucumcari Chevrolet–Geo, as well as Mills–Strebeck, had been fully insured with respect to the property at the time of the fire, when Tucumcari Chevrolet–Geo still bore the risk of loss. Tucumcari Chevrolet–Geo would have received $300,000 in insurance proceeds and would have had no obligation to pay any of that sum to Mills–Strebeck. In that event, Mills–Strebeck would not be entitled to collect any insurance proceeds on the property. As between the prospective seller and the prospective buyer, the proceeds should certainly go to the seller, who bore the risk of loss until the Management Agreement was approved by the bankruptcy court. Just as Mills–Strebeck's interest in recovering on its insurance policy should yield to the interests of the owner who bore the risk of loss, it should yield to the lienholder bank that bore a similar risk. The reduction in insurance proceeds necessary to avoid moral hazard should be borne

by Mills–Strebeck. In short, the $31,748.12 excess of the bank's insurance recovery over the $50,000 purchase price must be subtracted from Mills–Strebeck's recovery from Chrysler, to prevent total insurance recovery from exceeding $300,000.

{56} There is, however, one further complication. Mills–Strebeck contends that the insurance recovery by the bank has already been taken into account in stipulations entered into between the parties. That may be so. But the record on that point is not clear to us. We therefore remand for a determination of the issue by the district court.

{57} We now address the issues raised by Mills–Strebeck on its cross-appeal.

## V. REPLACEMENT COSTS

{58} Mills–Strebeck contends that the district court erred in its award of damages for destruction of the dealership property. The district court awarded damages based on the actual cash value of the property destroyed. Mills–Strebeck contends that it should have been awarded the replacement cost—that is, the amount of money necessary to purchase new replacements for the lost property.

{59} We disagree. The insurance policy that was deemed to cover Mills–Strebeck's loss contains a replacement-cost provision. Under the policy, however, this provision does not apply to "[p]roperty of others." Although we have held that Mills–Strebeck may have had an insurable interest in the dealership property destroyed by the fire, it did not have an ownership interest in the property. The insurable interest, if any, was only an expectancy. Hence, the replacement-cost provision does not apply. The district court did not err in awarding damages based on the actual cash value of the property.

## VI. POST–JUDGMENT INTEREST RATE

{60} Mills–Strebeck contends that the district court should have awarded post-judgment interest at the rate of fifteen percent per year rather than eight and three-quarters percent It raised this issue in a post-

judgment motion; but the district court did not rule on the motion, apparently because it believed that it had lost jurisdiction when Chrysler filed its notice of appeal. *See Kelly Inn No. 102, Inc. v. Kapnison,* 113 N.M. 231, 241–43, 824 P.2d 1033, 1043–45 (1992) (discussing jurisdiction of trial court after filing of notice of appeal.)

{61} Mills–Strebeck relies on NMSA 1978, § 56–8–4(A) (1993), which states:

> Interest shall be allowed on judgments and decrees for the payment of money from entry and shall be calculated at the rate of eight and three-quarters percent per year, unless the judgment is rendered on a written instrument having a different rate of interest, in which case interest shall be computed at a rate no higher than specified in the instrument *or the judgment is based on tortious conduct, bad faith, intentional or willful acts, in which case interest shall be computed at the rate of fifteen percent* .

(Emphasis added.) We agree in part with Mills–Strebeck. The portion of the judgment that awarded damages for bad faith should bear interest at the rate of fifteen percent. It was appropriate, however, for the district court to award damages at eight and three-quarters percent on the remainder of the judgment. We explain.

{62} To begin with, we do not read Section 56–8–4(A) as requiring a single post-judgment interest rate for the entire judgment. If, for example, a portion of a judgment is based on a tort cause of action and another portion is based on a contract cause of action, the interest rate on the first portion of the judgment could be fifteen percent and the interest rate on the second portion, eight and three-quarters percent. Disputes may arise regarding how to apportion a partial payment of the judgment (the judgment debtor wishing to apply payment to the tort damages, which bears the higher interest rate, and the judgment creditor preferring that the payment apply to the contract award); but we need not reach that issue here.

{63} Turning to the judgment in this case, the statute unambiguously requires that interest on the portion of the judgment awarded for bad faith be computed at fifteen percent. The more difficult question is how to categorize the remainder of the judgment. Mills–Strebeck contends that the judgment is based on tortious conduct—the negligent misrepresentations made by Rudel, Chrysler's agent. Chrysler, on the other hand, contends that the district court apparently believed that the cause of action "sounded primarily in contract."

{64} We agree with Chrysler. The district court awarded damages as measured by standard contract law. Mills–Strebeck was awarded the benefit of its bargain, the extent of insurance coverage promised by Rudel. *See Hubbard v. Albuquerque Truck Ctr., Ltd.*, 1998–NMCA–058, ¶ 15, 125 N.M. 153, 958 P.2d 111 (goal of damages for breach of contract is to put injured party in as good a position as if promise had been kept). Such damages are not ordinarily recoverable for a negligent misrepresentation. *See First Interstate Bank of Gallup v. Foutz*, 107 N.M. 749, 751, 764 P.2d 1307, 1309; Restatement (Second) of Torts, *supra*, at § 552B(2). Although the record is not clear regarding what legal doctrine was employed by the district court to award benefit-of-the-bargain damages, the award can best be understood as an application of the doctrine of promissory estoppel, which is generally considered to be a contract cause of action, *see Strata Prod. Co. v. Mercury Exploration Co.*, 121 N.M. 622, 628, 916 P.2d 822, 828 (1996) (Frost, C.J.); *Fryar*, 94 N.M. at 81, 607 P.2d at 619. Accordingly, we affirm the interest rate awarded in the judgment on the components of the judgment other than the damages for bad faith. We note, however, that our task of interpreting Section 56–8–4(A) is made more difficult by the absence of any apparent rationale for having the rate of post-judgment interest depend on the nature of the cause of action.

## VII. UNFAIR PRACTICES ACT

{65} The district court ruled that "the evidence does not support a conclusion that [Chrysler] violated the New Mexico Unfair Trade [sic] Practices Act." Mills–Strebeck contends that the court erred in this ruling because Rudel's misrepresentations violated the Act. It asserts that the judgment "should be modified to reflect an award of treble damages" for violation of the Unfair Practices Act. We are not persuaded.

{66} The Unfair Practices Act defines an "unfair or deceptive trade practice" as

[a]ny false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services [or] in the extension of credit or in the collection of debts by any person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person.

NMSA 1978, § 57–12–2(D) (1995) (second alteration in original). The definition then catalogs seventeen potential types of such practice. For purposes of this appeal, the key element of the definition is that the false or misleading statement must be "knowingly made." Accordingly, Mills–Strebeck had the burden of persuading the district court that Rudel knew that his representations regarding coverage were false or misleading.

{67} Mills–Strebeck did not meet this burden. The district court did not enter a finding that Rudel knew that the misrepresentations were false or misleading. When the factfinder rules against the party bearing the burden of persuasion, we must affirm if it was rational for the factfinder to be unpersuaded by the evidence supporting the party bearing the burden. *See Lopez v. Adams*, 116 N.M. 757, 758, 867 P.2d 427, 428 (1993). Mills–Strebeck has not demonstrated that every rational factfinder would have found that Rudel had the requisite knowledge.

{68} Nevertheless, Mills–Strebeck asserts that *Ashlock v. Sunwest Bank*, 107 N.M. 100, 753 P.2d 346 (1988), *overruled on other grounds by Gonzales v. Surgidev Corp.*, 120 N.M. 133, 140, 899 P.2d 576, 583 (1995), stands for the proposition that "Rudel's knowledge or intent at the time of the transaction is not relevant." We acknowledge that some language in *Ashlock* could be read to support this proposition. We are reluc-

tant, however, to read that decision as eliminating from the Unfair Practices Act the requirement that the false or misleading representation be "knowingly made." Indeed, *Ashlock* itself states that "[f]our elements must be established to invoke the Unfair Practices Act," and lists the second element as "the false or misleading representation must have been 'knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or ... collection of debts.'" *Id.* at 101, 753 P.2d at 347 (quoting NMSA 1978, § 57–12–2(D)) (ellipsis in *Ashlock*). Although *Ashlock* ruled that a statement could violate the statute even though it was not "made with the intent to mislead," *id.*, the opinion did not eliminate the "knowingly" requirement. Moreover, the concern of the *Ashlock* opinion appears to be bait-and-switch trade practices, *see id.* at 102, 753 P.2d at 348, which are not at issue in this case.

{69} In addition, an award of treble damages under the Unfair Practices Act is discretionary. NMSA 1978, Section 57–12–10(B) (1987), states that upon finding a willful violation of the act, "the court *may* award up to three times actual damages." (Emphasis added.) *See Ashlock,* 107 N.M. at 101, 753 P.2d at 347 (noting this "permissive language"). Hence, even if the district court had been compelled to find a violation of the Unfair Practices Act in this case, it was not required to award any additional damages to Mills–Strebeck. We affirm the district court's denial of the claim under the Unfair Practices Act.

## VIII. PUNITIVE DAMAGES

{70} The district court denied Mills–Strebeck's claim for punitive damages. Conclusion of Law 36 states: "The evidence does not support a conclusion that in adjusting this claim that [Chrysler] acted with an evil nature or other culpable mental state; punitive damages are therefore not appropriate."

{71} Mills–Strebeck argues that inasmuch as the district court found that Chrysler had acted in bad faith, an award of punitive damages is mandatory. We disagree. "An award of punitive damages is discretionary." *Jackson Nat'l Life Ins. Co.*

*v. Receconi,* 113 N.M. 403, 419, 827 P.2d 118, 134 (1992). "It is generally agreed that punitive damages are a windfall to the plaintiff and not a matter of right, and that it is always within the discretion of the jury or trial judge to withhold them." William L. Prosser and W. Page Keeton, *Prosser & Keeton on the Law of Torts* § 2, at 14 (5th ed.1984).

{72} To the extent that Mills–Strebeck seeks reversal on the ground that the district court acted under a misconception of the legal standard for awarding punitive damages, we disagree. In *Paiz v. State Farm Fire & Casualty Co.,* 118 N.M. 203, 211, 880 P.2d 300, 308 (1994), our Supreme Court wrote:

> [T]o reaffirm that this Court has not lost sight of the limited purpose of punitive damages—to punish and deter persons from conduct manifesting a "culpable mental state"—we now disavow the proposition that in a contract case, including one involving an insurance contract, punitive damages may be predicated solely on gross negligence. In addition to, or in lieu of, such negligence there must be evidence of an "evil motive" or a "culpable mental state."

As we read *Paiz,* even when the insured proves bad faith, it must also prove an evil motive or a culpable mental state to be entitled to punitive damages. Our Supreme Court's recent decision in *Allsup's Convenience Stores, Inc. v. The North River Insurance Co.,* 1999–NMSC–006, ¶ 46, 127 N.M. 1, 976 P.2d 1, supports this view. We assume that the district court used the term "evil nature" as a synonym for "evil motive."

{73} The district court did not abuse its discretion. We affirm the denial of punitive damages.

## IX. CONCLUSION

{74} We affirm the district court's order permitting Mills–Strebeck to be added as a party plaintiff. We affirm the award of damages for bad faith handling of the GKLL coverage but remand for modification of that portion of the judgment to award post-judgment interest at the rate of fifteen percent

per year. We also affirm the district court's denial of Mills–Strebeck's claims for damages under the Unfair Practices Act and for punitive damages. With respect to Mills–Strebeck's claim of damages for property loss, we reverse and remand for a determination by the district court regarding whether Mills–Strebeck had an insurable interest in the dealership property at the time of the fire. If Mills–Strebeck did not have an insurable interest, the district court must amend the judgment to eliminate all damages except those arising out of the claim for bad faith in handling the GKLL coverage. If the district court determines that Mills–Strebeck had an insurable interest in the property, it should then calculate the extent of that interest in conformity with the analysis set forth in this opinion. Mills–Strebeck's damages for such property loss should be limited to the actual value of the property, rather than the replacement cost, and post-judgment interest on the damages should be set at eight and three-quarters percent per year.

{75} IT IS SO ORDERED.

BUSTAMANTE and ARMIJO, JJ., concur.

## ORDER ON MOTION FOR REHEARING

BUSTAMANTE, Judge.

■ {76} All parties have requested rehearing on various aspects of our opinion filed March 8, 1999. After due consideration, we have determined to deny the requests. However, one aspect of the motions—addressing the proper standard for granting punitive damages in insurance-bad-faith cases—requires extended discussion. Rather than revise the opinion, we have opted to respond in this separate published Order.

{77} Teague–Strebeck and Mills–Strebeck (Plaintiffs) assert that the opinion misapprehends New Mexico law regarding punitive damages in the context of insurance bad faith. Plaintiffs remind us that our Supreme Court has just recently stated that "bad faith ... is a culpable mental state." *Allsup's Convenience Stores, Inc. v. North River Ins. Co.,* 1999–NMSC–006, ¶ 53, 127 N.M. 1, 976

P.2d 1. Based on that statement—and earlier cases including language to the same effect—Plaintiffs argue that "New Mexico law clearly provides for punitive damages in insurance cases based solely on bad faith," and that it is improper to require anything in addition as a prerequisite to awarding punitive damages. *See Jessen v. National Excess Ins. Co.,* 108 N.M. 625, 627, 776 P.2d 1244, 1246 (1989) ("Bad faith supports punitive damages upon a finding of entitlement to compensatory damages."); *United Nuclear Corp. v. Allendale Mut. Ins. Co.,* 103 N.M. 480, 485, 709 P.2d 649, 654 (1985) ("To assess punitive damages for breach of an insurance policy there must be evidence of bad faith or malice in the insurer's refusal to pay the claim.").

{78} In essence, Plaintiff's position is that conduct sufficient to support bad faith compensatory damages against one's insurer is necessarily synonymous with conduct sufficient to support an award of punitive damages. With this we disagree. Rather, New Mexico and other jurisdictions require the presence of aggravated conduct beyond that necessary to establish the basic cause of action in order to impose punitive damages. We rely on *Paiz v. State Farm Fire & Casualty Co.,* 118 N.M. 203, 210, 880 P.2d 300, 307 (1994), and *Allsup's,* 1999–NMSC–006, ¶ 46, 127 N.M. 1, 976 P.2d 1, for our conclusion. *See generally* Stephen S. Ashley, *Bad Faith Actions* § 8.06 (2d ed. 1997); John C. McCarthy, *Recovery of Damages for Bad Faith* §§ 1.60 (5th ed. 1990).

{79} *Paiz* was a first party insurance-bad-faith case. Plaintiffs in *Paiz* sued their insurer and insurance agent because the insurer denied a fire-loss claim. *See* 118 N.M. at 205, 880 P.2d at 302. The trial court directed a verdict against Plaintiffs on their bad faith tort-based claim. *See id.* at 206, 880 P.2d at 303. However, the case was submitted to the jury on several theories including breach of contract, negligent misrepresentation, negligent investigation and negligent delay in making payment. *See id.* at 205, 880 P.2d at 302. The trial court also submitted a punitive damages instruction against the insurer alone based on a theory of gross negligence. *See id.* The jury returned a verdict of $380,000 in compensatory

damages and $485,000 in punitive damages. *See id.* at 206, 880 P.2d at 303. On appeal our Supreme Court re-examined the basis for punitive damages in breach-of-contract cases. The Supreme Court first acknowledged that it had previously applied a more relaxed standard for punitive damages in insurance-contract cases. *See id.* at 210–11, 880 P.2d at 307–08; *see also Romero v. Mervyn's,* 109 N.M. 249, 255 n.3, 784 P.2d 992, 998 n.3 (1989) ("We have allowed the award of punitive damages in insurance cases under a more relaxed standard in part because of the fiduciary obligations inhering in insurance relationships and because of concerns arising from the bargaining position typically occupied by the insured and insurer."). The court then held:

> However, to reaffirm that this Court has not lost sight of the limited purpose of punitive damages—to punish and deter persons from conduct manifesting a "culpable mental state"—we now disavow the proposition that in a contract case, including one involving an insurance contract, punitive damages may be predicated solely on gross negligence. In addition to, or in lieu of, such negligence there must be evidence of an "evil motive" or a "culpable mental state."
>
> A mental state sufficient to support an award of punitive damages will exist when the defendant acts with "reckless disregard" for the rights of the plaintiff—i.e., when the defendant *knows* of potential harm to the interests of the plaintiff but nonetheless "utterly fail[s] to exercise care" to avoid the harm.

118 N.M. at 211, 880 P.2d at 308 (citation absent from original) (alteration in original). *Paiz* thus brought the standard for awarding punitive damages in contract-based insurance-bad-faith cases into line with other contract cases. *Cf. Eckhardt v. Charter Hospital,* 1998–NMCA–017, ¶ 57, 124 N.M. 549, 953 P.2d 722 (applying the same standard and rationale to punitive damages in tort cases).

{80} We note that in *Paiz* the Supreme Court cited with approval *Linthicum v. Nationwide Life Insurance Co.,* 150 Ariz. 326, 723 P.2d 675 (1986) (in banc). *See* 118 N.M. at 211, 880 P.2d at 308. *Linthicum* was an insurance-bad-faith and breach-of-contract case in which compensatory and punitive damages had been awarded against the insurer. The Arizona Court of Appeals affirmed the compensatory award but reversed the punitive damages award. *See* 723 P.2d at 676. The Arizona Supreme Court granted review as to the issue of punitive damages only. *See id.* Prior to oral argument, the Supreme Court asked counsel to address the following question:

> 1. Assuming that indifference to or failure to consider the interests of the insured is sufficient grounds for award of tort damages in a bad faith case, what additional requirement or standard is appropriate to justify an award of punitive damages?

*Id.*

{81} After generally clarifying Arizona's punitive damages law, the Supreme Court held: "In a bad faith tort case, as with all other torts, punitive damages are not awardable unless there is something more than the conduct required to establish the tort." *Id.* at 681. *See also Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565, 577 (1986) (en banc) (rejecting argument that "since bad faith is a species of intentional tort, punitive damages are automatically recoverable in every case in which the plaintiff proves that the tort was committed").

{82} *Paiz* left unanswered several questions. Among them are (1) whether evidence of bad faith requires giving a jury instruction on punitive damages, (2) whether a finding of bad faith requires an award of punitive damages, and (3) whether a finding of bad faith would by itself be sufficient to support an award of punitive damages. We need not concern ourselves here with the first question because this matter was tried to the court alone.[1] As to the second, Plaintiffs concede that an award of punitive damages is

---

1. We note, however, that *Paiz* was decided in 1994, three years after our bad faith jury instructions were adopted by the Supreme Court. UJI 13–1718 NMRA 1999 clearly contemplates the giving of a punitive damages instruction in *every* bad faith case submitted to a jury. *See id.* (Directions for Use). Given the holding in *Paiz,* and the language in *Allsup's,* upon which we rely, it would seem appropriate to reconsider this approach.

not mandatory even when bad faith is found. *See* UJI 13–1718 NMRA 1999 ("If you find that plaintiff should recover compensatory damages for the bad faith actions of the insurance company, then you *may* award punitive damages." (Emphasis added)). The third question is answered by *Allsup's*.

{83} We have already noted the passage from *Allsup's* upon which Plaintiffs rely. That passage provides some support for Plaintiff's position. However, another discussion earlier in *Allsup's* is much more pertinent to our inquiry. Defendant North River's first challenge to the punitive damages award against it was that "insurance companies . . . were singled out by the jury instructions as having to act only unreasonably, as opposed to acting in bad faith, in order to be held liable for punitive damages, and that its due process right was thereby violated." 1999–NMSC–006, ¶ 44, 127 N.M. 1, 976 P.2d 1. North River pointed to a jury instruction essentially identical to UJI 13–1705 NMRA 1999 as symptomatic of the problem it faced. *See id.*

{84} In response, the Supreme Court quoted with approval another instruction given to the jury as clarifying any ambiguity in the instruction North River challenged.

> To establish the claim of breach of the implied covenant of good faith and fair dealing by defendants . . ., Allsup's has the burden of proving that one or more of the defendants acted in bad faith by not giving equal consideration to the interest of Allsup's as to its own interest in at least one of the following ways . . .
>
> Related to its claims for punitive damages, Allsup's contends and has the burden of proving that any bad faith actions on the part of North River were malicious, reckless or wanton, and, therefore punitive damages should be awarded.

*Id.* ¶ 46 (second alteration in original) (emphasis omitted). Asserting that this instruction comported with its holding in *Paiz*, the Supreme Court wrote:

> Reading both instructions together clearly advised the jury that if it found that North River acted in bad faith, it *also* had to determine whether this constituted malicious, reckless, or wanton conduct before it

could award punitive damages. The jury was adequately instructed on the issue of punitive damages.

*Id.* (emphasis added).

{85} This discussion clearly indicates there is a real distinction between "bad faith" sufficient to support an award of compensatory damages and "bad faith" meriting exemplary damages. In appropriate circumstances "bad faith" may include a culpable mental state, but it is not necessarily so.

■ {86} We recognize the potential for confusion arising from nomenclature. The causes of action we are discussing are commonly called "insurance bad faith cases." In ordinary parlance and meaning bad faith connotes highly improper, probably evil, intent and purpose. Given that meaning, a person acting in bad faith would be deserving of some sort of punishment. However, the New Mexico cause of action for insurance bad faith does not require proof of aggravated misconduct or a culpable mental element to stand.

■ {87} As noted in the Committee Comment to UJI 13–1701 NMRA 1999, in New Mexico "[t]he cause of action for bad faith arises from a breach of the obligation of good faith." The covenant of good faith and fair dealing is imposed by law in every contractual insurance relationship requiring the parties to deal fairly and honestly with each other. *See id; see also* UJI 13–1710 NMRA 1999. The covenant of good faith and fair dealing in a first-party claim situation can be breached in a number of ways, though the most common are failures to act reasonably in timely and fairly investigating and evaluating claims and unreasonable delays in responding to claims. *See* UJI 13–1702 NMRA 1999; *see also* UJI 13–1705. Thus, an insurer can breach the covenant of good faith and be liable under our uniform jury instructions by actions that do not evince evil motive or other culpable mental state.

{88} The culpability of the insurer is measured on a continuum of reasonableness imposed in light of the insurer's fiduciary obligation to its insured. At one end, the insurer acts reasonably in all respects and is

not liable except under its contract. Further along, the insurer's acts are unreasonable enough to allow damages against it in tort. At some point, the insurer's acts and motives become qualitatively different and are reprehensible enough to merit punishment. This is the message of the following language in *Allsup's:*

> We think the jury was more likely to comprehend the instruction as meaning that the good faith of the insurance company is determined by how reasonable the conduct of the insurance company is. In turn, the bad faith of the insurance company may be measured by how unreasonable its conduct is. While bad faith and unreasonableness are not always the same thing, there is a certain point, determined by the jury, where unreasonableness becomes bad faith and punitive damages may be awarded.

1999–NMSC–006, ¶ 45, 127 N.M. 1, 976 P.2d 1.

{89} Given the Supreme Court's efforts to re-focus the role and purpose of punitive damages in *Paiz* and other cases, acceptance of Plaintiffs' position carries another consequence, probably undesired by most plaintiffs. If punitive damages could be awarded for every breach of the covenant of good faith and fair dealing, the standard for all bad-faith cases would have to be raised accordingly. That is, a possible effect would be to make it more difficult to obtain compensatory damages in the less aggravated, more "run-of-the-mill" cases.

{90} Turning our attention to this case, the district court entered lengthy findings of fact detailing the events, acts, and failures to act supporting a determination of bad faith. Despite these findings, the district court concluded: "The evidence does not support a conclusion that in adjusting this claim that [Chrysler] acted with an evil nature or other culpable mental state; punitive damages are therefore not appropriate." Plaintiffs argue that this conclusion of law incorrectly applied a heightened standard for punitive damages, and that punitive damages should have been considered solely on the basis of the district court's discrete bad-faith determinations. As we have already demonstrated, New Mexico now requires a showing of a culpable mental element to allow imposition of punitive damages. The district court was correct in measuring Chrysler's conduct against the standard of evil motive or culpable mental state despite the statement in *Jessen,* 108 N.M. at 627, 776 P.2d at 1246, that "[b]ad faith supports punitive damages upon a finding of entitlement to compensatory damages." That formulation must be viewed as having been superseded by *Paiz* and *Allsup's.*

{91} We deny the remaining points in Plaintiffs' Motion for Rehearing, except to acknowledge that our use of the figure "$300,000" for the damages figure was only illustrative and used for drafting convenience. The precise damage figure is, of course, subject to calculation on remand.

{92} With respect to Chrysler's motion for rehearing, the district court may adjust the award of attorney fees and costs if the court determines that Plaintiffs did not have an insurable interest.

{93} Because of the tragic death of former Chief Justice Frost, further evidentiary proceedings may be necessary on remand.

{94} IT IS SO ORDERED.

HARTZ and ARMIJO, JJ., concur.